**BOB WILLOW MOTORS, INC., a Wisconsin corporation, Plaintiff–Appellee, Cross–Appellant,**

v.

**GENERAL MOTORS CORPORATION, a Delaware corporation, Defendant–Appellant, Cross–Appellee.**

Nos. 88–1889, 88–1954.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 28, 1988.

Decided April 24, 1989.

David J. Hase, Foley & Lardner, Milwaukee, Wis., for defendant-appellant, cross-appellee.

Jeffrey R. Brauchle, Holmes & Graven, Minneapolis, Minn., for plaintiff-appellee, cross-appellant.

Before CUDAHY and MANION, Circuit Judges, and WILL, Senior District Judge.*

MANION, Circuit Judge.

Bob Willow Motors, Inc. ("Willow") filed suit against General Motors Corporation ("GM"), bringing claims under the Automo-

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

bile Dealers' Day In Court Act ("Dealer Act"), 15 U.S.C. §§ 1221–1225, Wis.Stat. Ann. §§ 218.01(3)(a)17 (wrongful termination), (3)(a)26m (refusal to allow shared facilities or additional franchise), (3)(a)11 (unconscionable practices), and common law tort (interference with Willow's business). The district court granted GM's motion for a directed verdict on the tortious interference claim and did not submit Willow's claim under § 218.01(3)(a)26m to the jury. Three claims went to the jury: unconscionable practices, wrongful termination, and the Dealer Act.

The court held a bifurcated trial. The jury found GM liable on all three claims and awarded Willow $631,000 for past lost profits, nothing for future lost profits, and $600,000 in punitive damages. GM filed alternative motions for judgment notwithstanding the verdict or a new trial. The district court denied the motions, but reduced the untrebled damages by $230,000. The district court also concluded the wrongful termination liability finding was a "nullity" because the jury awarded nothing for future lost profits. Willow accepted the remittitur and the district court entered a revised judgment. The judgment was further amended to include an award of attorney's fees together with post-verdict interest and costs. The court denied Willow's application for costs except for those costs contained in 28 U.S.C. § 1920. Both parties appeal. We affirm.

## I.

Robert E. Willow purchased an existing Chevrolet/Oldsmobile dealership in Menomonie, Wisconsin, in February 1974, and entered into Dealer Sales and Service Agreements ("Dealer Agreements") with GM's Chevrolet Motor Division ("Chevrolet") and Oldsmobile Division ("Oldsmobile"). Willow built a new facility in 1976. Before moving in, Willow entered into Dealer Agreements with Chrysler Corporation ("Chrysler"), adding Chrysler and Plymouth automobiles and Dodge trucks to its product lines. Willow did not notify GM before entering into the Chrysler Dealer Agreements, and GM never provided written approval.

Willow's business was successful during the 1970's. Sales and revenues continually increased from 1974 to 1979, and Willow showed a net profit each year. Willow, however, along with the rest of the domestic car industry, suffered from the 1979 energy crisis and high interest rates that followed. In response, Willow instituted a new sales program, selling cars at a fixed amount over invoice. Initially, Chevrolet and Oldsmobile were enthusiastic about the program.

But soon after Willow implemented its new sales program, Chevrolet's district manager informed it that Chevrolet's regional zone disliked the program and that the zone had received complaints from other area dealers. The manager suggested that Willow change the program.

Willow then began to experience product allocation problems. Chevrolet's district manager advised Willow that the zone was adjusting allocations to remove cars from Willow, but refused to give a further explanation. Eventually, the manager stopped giving any allocation figures to Willow. Besides allocation problems, Willow faced long shipping delays and difficulty in placing production orders. Frustrated, Willow finally quit taking new car orders altogether because there was no realistic hope of filling them.

Besides the sales program, Willow took further steps to strengthen its financial outlook. At the suggestion of its banker, Willow arranged to share its facilities with a local Ford dealer. In 1982, Mar–Ren, Ltd., the Ford dealer, moved onto Willow's lot. Willow did not seek GM's approval before consummating the deal with Mar–Ren.

Shortly afterwards, the Chevrolet zone manager wrote Willow, stating that Chevrolet considered Mar–Ren's presence to be in violation of the Chevrolet and Oldsmobile Dealer Agreements and threatening to terminate the agreements unless Mar–Ren vacated Willow's lot within thirty days. GM considered Willow in breach of the Dealer Agreements in two respects. First,

Willow neither notified GM nor sought its approval before permitting Mar–Ren to share the premises. Second, GM claimed that Mar–Ren's presence violated the Dealer Agreements' space guideline provisions. GM had never objected to Willow's carrying Chrysler products and it did not object to the absence of advance notice when Willow entered into the Chrysler Dealer Agreement in 1976. Willow's attorney offered a plan to satisfy GM's objections, but GM never responded.

In early 1983, GM sent termination notices to Willow. Willow, however, filed a protest with the Wisconsin Commissioner of Transportation which, under Wisconsin law, automatically stayed the termination notices. Thus, Willow continued operating under the Chevrolet and Oldsmobile Dealer Agreements. But Willow's financial problems mounted throughout 1983 and 1984 and it eventually declared Chapter 11 bankruptcy in February, 1985.

After the jury found for Willow on all three claims, GM filed motions for j.n.o.v. or in the alternative a new trial. These motions advanced fourteen separate challenges to both the liability and damage verdicts. The trial court denied the motions. It held that the unconscionability claim was properly in the case and that there was sufficient evidence to support the liability verdict as to both the Dealer Act and the unconscionable practices claims. The court cited evidence that GM limited Willow's allocation of new vehicles, withheld allocation information, extended time of vehicle delivery, and refused to accept Willow's facilities. (App. 7, 9–10) The court also held there was substantial evidence to support the damage award. However, the court ordered remittitur of $230,000 and vacated the punitive damages. It trebled the remaining damages under § 218.01(9)(a). Wis.Stat.Ann. § 218.01(9)(a).

GM appeals the denial of its motions on several grounds. It argues first that the unconscionable practices claim (§ 218.-01(3)(a)11) was untimely added. Regardless, GM contends, § 218.01(3)(a)11 is not applicable to manufacturers such as GM.

GM further argues that, even if § 218.01(3)(a)11 is applicable, the trial court nevertheless erred because its unconscionable practices jury instruction was erroneous. Next, GM argues the evidence failed to support the Dealer Act verdict. GM then claims that the district court's erroneous submission of the punitive damages issue was prejudicial error as a matter of law, requiring a new trial. Finally, GM asks for a new trial as to damages, complaining that no competent or credible evidence supported the damage verdict.

The district court denied Willow's application for costs for anything beyond those provided for in 28 U.S.C. § 1920. Willow filed a cross-appeal, seeking additional costs under Wis.Stat.Ann. § 218.01(9)(a).

## II. Wisconsin Unconscionable Practices Claim

### A. GM Was Fairly Charged With Notice of Willow's Unconscionability Claim.

GM complains on appeal that it was prejudiced by the last-minute addition of the unconscionability claim. We are not persuaded. It is true that Willow's complaint failed specifically to cite § 218.01(3)(a)11. But that is not dispositive under the Federal Rules of Civil Procedure. *American Timber & Trading Co. v. First National Bank of Oregon*, 690 F.2d 781, 786 (9th Cir.1982). A complaint must only set forth a "short and concise statement of the claim showing that the pleader is entitled to relief." *Tremps v. Ascot Oils, Inc.*, 561 F.2d 41, 45 (7th Cir.1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The statement must give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Id.* To this end, pleadings are liberally construed and each theory need not be explicitly spelled out, so long as the other side receives notice as to what is at issue in the case. *American Timber & Trading Co.*, 690 F.2d at 786. "[I]n deciding whether a complaint fairly notifies a defendant of matters sought to be litigated, courts have often looked beyond the pleadings to the pretrial conduct and communication of the parties." *Sundstrand*

*Corp. v. Standard Kollsman Industries, Inc.*, 488 F.2d 807, 811 (7th Cir.1973).

Essentially, GM argues that the last-minute introduction of the unconscionable practices claim took it by surprise. This is belied, however, by GM's position before the district court. At the pretrial conference, GM objected to the inclusion of the unconscionability claim. But its reasoning before the district court was much different than what is argued here. There GM argued that the unconscionability claim was "subsumed" in the wrongful termination claim (§ 218.01(3)(a)17) and that Willow should not get "two kicks at the cat" by adding the cumulative unconscionability claim. (Tr. 17, 18). Obviously, under that reasoning, GM should have been fully aware of the unconscionability claim because it was "subsumed" in the wrongful termination claim. That is, no new facts needed to be alleged, and the specific section of the statute did not even need to be mentioned because the one claim was "subsumed" in the other. Now, however, GM contends it was unaware of the claim all along.

Willow's complaint described GM's misconduct in great detail. (App. 36–42). This included establishing unfair space guidelines for dealerships which were unevenly enforced, deliberate delays in filling and shipping orders, and discriminatorily allocating new cars. All of these allegations were the subject of extensive discovery. The evidence for the unconscionability claim was identical to that for the Dealer Act violation (App. 7–8)—though the standards for liability differ. The trial court recognized this when it stated it would have allowed Willow to amend its complaint even after trial to conform to the evidence. (App. 13–14) The only thing missing from the amended complaint, then, was the specific statutory cite. But even in its absence, GM was on notice that the claim was included.

In opposition, GM relies on *Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.*, 93 F.R.D. 858 (D.Del.1982). But *Rose Hall* does not compel a contrary conclusion. There, the district court stated a "plaintiff who proposes to rely on the same facts to support different theories should be required to make known *by pleadings or otherwise* what theories he will rely on...." *Id.* at 865 (emphasis added). Moreover, the court noted that "if facts are pleaded which establish that a recovery is warranted, a Court will apply the relevant theory even though not pleaded." *Id.* at 862. Here, GM was made aware of the unconscionability claim by Willow's detailed pleadings or by its own exhaustive discovery which followed the final amendment of the complaint.

GM also relies on *Jakobsen v. Massachusetts Port Authority*, 520 F.2d 810 (1st Cir.1975) and *Stanek v. Trailmobile, Inc.*, 283 F.2d 827 (7th Cir.1960). Both are inapposite. In *Jakobsen*, the district court refused defendant's request to add a new defense offered for the first time at the close of plaintiff's evidence in a motion for a directed verdict. The First Circuit affirmed, observing that the new defense involved complicated issues of fundamental importance and evidence different from what already had been presented at trial. Here, by contrast, the evidence for Willow's "new" claim was identical to that needed for the explicitly pleaded Dealer Act claim, and, as mentioned, GM thoroughly explored it in pretrial discovery. In *Stanek*, the plaintiff orally moved on the first day of trial to add a contract claim to his suit for misrepresentation. This came three years after the suit was filed and after costly discovery limited to the misrepresentation claim was completed. The court of appeals affirmed the district court's refusal to allow the amendment. As in *Jakobsen*, the new claim in *Stanek* was completely different than the pleaded claim. This is not the case here. Indeed, GM argued the unconscionability claim was "subsumed" in the wrongful termination claim.

**B. Section 218.01(3)(a)11 (Unconscionable Practices) Applies To Manufacturers.**

 GM next argues that § 218.01(3)(a)11 does not apply to manufacturers such as GM, because manufacturers are not licensees for purposes of § (3)(a)11.

That section prohibits "any unconscionable practice relating to said business." According to GM, the phrase "said business" must refer to the immediately preceding antecedent (§ (3)(a)10) which deals with finance companies, not manufacturers. GM reaches this conclusion by interpreting *Fuller v. Spieker*, 265 Wis. 601, 62 N.W.2d 713, 715 (1954), as establishing a hard and fast rule requiring that limiting words in a statute be construed to refer to their immediately preceding antecedent. But the Wisconsin Supreme Court did not go that far in *Fuller*. Rather, it held simply that " '[t]he rule is that qualifying or limiting words or clauses in a statute are to be referred to the next preceding antecedent, *unless the context or the evident meaning of the enactment requires a different construction.*' " *Id.* (quoting *Jorgenson v. City of Superior*, 111 Wis. 561, 87 N.W. 565, 567 (1901)) (emphasis added) (GM omitted the italicized portion of the quote in its discussion). Neither § 218.01(3)(a)11's context nor its evident meaning support GM's strained interpretation.

The question presented apparently has not been squarely addressed by any Wisconsin court. We note, though, that the court in *Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 405 N.W.2d 354 (Wis.Ct.App.), *rev. denied*, 138 Wis.2d 531, 412 N.W.2d 893 (1987), upheld a verdict against Ford Motor Company under § 218.01(3)(a)11, even though it did not expressly hold that manufacturers were covered under that section. In any event, this does not present an obstacle because the statute's meaning is clear.

Section 218.01 is remedial in nature and should be liberally construed. *Department of Transportation v. Transportation Commission*, 111 Wis.2d 80, 330 N.W.2d 159, 164–65 (1983) (construing § 218.01(3)(a)6). The "primary source for construction of a statute is its language." *State ex rel. Smith v. City of Oak Creek*, 139 Wis.2d 788, 407 N.W.2d 901, 904 (1987) (citation omitted). If a statute's meaning is clear and unambiguous it is "inappropriate" to "resort to extrinsic aids, such as legislative history, for the purpose of statutory construction." 407 N.W.2d at 905.

The district court rejected GM's interpretation and "specifically determine[d] that the unconscionable practice section (11) is available to a dealer when making a claim against a manufacturer." (App. 15) We give substantial weight to interpretations of state law by a federal district judge sitting in the state whose law is at issue. *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987).

We believe § (3)(a)11's clear meaning is that it applies to all licensees under § 218.01, whether they be manufacturers, dealers or finance companies. "No manufacturer of motor vehicles ... shall engage in business as such in [Wisconsin] without a license therefor as provided in this section." Section 218.01(2)(am). The business for which a license is required is defined by the statute. A "manufacturer," for example, is defined as, among other things, a "person, resident or non-resident who manufactures or assembles motor vehicles." Section 218.01(1)(*l*). Section (3)(a) provides that licenses may be revoked, suspended or denied on several grounds, including for "indulg[ing] in any unconscionable practice relating to said business." Section 218.01(3)(a)11. We think the phrase "relating to said business" plainly refers to the business for which a license was obtained. In the case of GM, this would be the manufacturing business.

Further support for this conclusion can be found in § 218.01(9)(a). That section creates a private cause of action for licensees and retail buyers injured by violations of certain sections of § 218.01(3)(a), including § (3)(a)11. It provides "[a]ny licensee suffering pecuniary loss because of a violation by any other licensee of sub. (3)(a) ... 11 ..." may recover treble damages, attorney's fees and costs. Using the language "any other licensee" in reference to violations of § (3)(a)11 further establishes the Wisconsin legislature's intent to prohibit unconscionable practices by *all* licensees under § 218.01, including manufacturers.

Even if § 218.01(3)(a)11 were ambiguous, though, its "scope, history, context, and object intended to be accomplished" support our interpretation. *Selzler v. Dresser*,

*Osceola, Garfield Fire Dept.*, 141 Wis.2d 465, 415 N.W.2d 546, 548 (Wis.Ct.App.), *rev. denied*, 142 Wis.2d 949, 417 N.W.2d 896 (1987). In "determining the legislature's intent, we presume that the legislature intended an interpretation that advances the purposes of the statute." *Selzler*, 141 Wis.2d 465, 415 N.W.2d at 548–49. The Wisconsin appellate court recently observed that:

> Section 218.01, Stats., is a remedial statute with a purpose to furnish a motor vehicle dealer with some protection against unfair treatment by a manufacturer. (Citation omitted.) It was enacted in recognition of the long history of abuse of dealers by manufacturers.

*Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 405 N.W.2d 354, 369. Interpreting § 218.01(3)(a)11 to prohibit unconscionable practices by automobile manufacturers is in complete harmony with the purpose of protecting dealers from abusive manufacturers.

Finally, we are unpersuaded by GM's argument that § 218.01(3)(a)11 should not apply to manufacturers because, unlike §§ 218.01(3)(a) 15, 16, 17, 22, 23, 24, 26, 26m, 32, and 35, it does not expressly mention manufacturers. We see it differently. Each of those sections contains the preface "[b]eing a manufacturer of motor vehicles...." Rather than reading this language to limit the section's application to manufacturers in only those few instances, we think each ground in § (3)(a) applies to all licensees, unless expressly limited to manufacturers.

C. Unconscionable Practices Jury Instruction.

 The unconscionable practices jury instruction read "an unconscionable act is one which is so unfair or outrageous or unreasonable that equity demands that the wrong be remedied." (App. 77) Before trial, GM simply objected to the submission of any instruction concerning unconscionable acts. In its motion for j.n.o.v. and on appeal, though, GM also objected to the substance of the instruction, arguing it erroneously provided a subjective, rather than

objective, standard to establish liability. Because GM's initial objection dealt only with the submission of the instruction, it waived any challenge to the instruction's substance. *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1295–96 (7th Cir.1987).

Rule 51 of the Federal Rules of Civil Procedure promotes judicial economy. It provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The purpose of the objection is to give the trial court an opportunity to correct any errors it has made. *General Beverage Sales Co. v. East–Side Winery*, 568 F.2d 1147, 1152 (7th Cir.1978). Failure to properly object waives any challenge on appeal. *Williamson v. Handy Button, supra; George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1348 (7th Cir.1983).

In *Williamson v. Handy Button, supra*, this court held that an objection to a concededly poorly drafted jury instruction was waived because the defendant had objected only "to giving any such instruction at all" and not to the language used. We explained that merely objecting "to giving any instruction at all ... is not the same as objecting to the language of the instruction given. The objection must be sufficiently detailed to draw the court's attention to the defect." *Id.* at 1295. Likewise in *George A. Fuller Co., supra*, we held that an objection directed only at the instruction's style—it was claimed to be argumentative—failed to inform the trial court of additional specific objections claimed on appeal regarding the same instruction. As a result, the specific objections were held to be waived.

As discussed, GM objected to the inclusion of the unconscionable practices claim in this case. At the pretrial conference, GM took the position that the claim was "subsumed" in the wrongful termination claim and therefore was cumulative. (Tr. 1–21) During the same conference, GM's

attorney stated with respect to Willow's proposed unconscionable practices jury instruction, "[t]he Court has heard my objections to that in respect to the [special] verdict [form]. *They are the same in respect to the instructions.*" (Tr. 12) (Emphasis added.) (GM added nothing to its objection at the instruction conferences.) GM objected only to the submission of the unconscionable practices instruction because it was redundant or subsumed in another claim. On appeal and in its motion for j.n.o.v., GM supplemented its objection, arguing that the instruction erroneously provided a subjective standard for establishing liability. This comes too late. From our review of the record, we see no possible way the trial court could have known of GM's substantive objection to the wording of the instruction. Thus, it was deprived of the opportunity to correct any error in the instruction (we do not decide whether an error was made). *General Beverage,* 568 F.2d at 1152. The objection has been waived.

But GM contends its objection nevertheless was implicit. We disagree. GM's position was clear; it objected to the inclusion of any instruction at all, not to the specific language used. *Williamson v. Handy Button, supra.* Even under the most charitable reading of GM's objection, we cannot say that GM somehow had made known its objection to the trial court, making a further, and clearer, objection unnecessary. *Industrial Development Board v. Fuqua Industries,* 523 F.2d 1226, 1237 (5th Cir. 1975). At best, GM's pretrial objection informed the district court that it thought the unconscionability claim was subsumed in the wrongful termination claim. We fail to see how this made the court aware of GM's objection now advanced on appeal.

■ Finally, we reject GM's argument that the unconscionable practices instruction was so erroneous and so prejudicial that it constituted plain error, requiring reversal even absent an objection. GM cites *Bowley v. Stotler & Co.,* 751 F.2d 641 (3d Cir.1985) and *Industrial Development Board, supra;* however, this circuit has held "that in civil cases a plain error doc-trine is not available to protect parties from erroneous jury instructions to which no objection was made at trial." *Deppe v. Tripp,* 863 F.2d 1356, 1362 (7th Cir.1988); *see also Williamson v. Handy Button,* 817 F.2d at 1295.

### D. Sufficiency of the Evidence.

■ GM has not argued to this court that the evidence fails to support the unconscionable practices verdict. GM's "argument" regarding the sufficiency of the evidence amounts to a mere single line in the "summary of argument" section of its opening brief. (In response to a specific question at argument, GM again said it was raising this argument.) Federal Rule of Appellate Procedure 28(a)(4) sets the standard for an appellant's argument, requiring it to "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." This plainly requires more than a single summary sentence unsupported by any authority whatever. *Sere v. Board of Trustees,* 852 F.2d 285, 287–88 (7th Cir.1988).

GM cannot argue it implicitly challenged the sufficiency of the evidence for the unconscionable practices claim by making a similar challenge to the Dealer Act claim, for as GM has pointed out, the two claims are not the same. The standard of liability under the unconscionable practices claim was whether GM's acts were "so unfair or outrageous or unreasonable that equity demands that the wrong be remedied." (App. 77) Under the Dealer Act, the issue was whether GM failed to act in "good faith." 15 U.S.C. § 1221(e). Had GM wished to preserve this argument, it would have been necessary to argue that, even under the unconscionable practices instruction as given, the evidence fell short. For whatever strategic reason, it did not. The argument has been waived.

### III. Dealer Act

■ GM argues that the evidence was insufficient to sustain the Dealer Act liability verdict. It contends the evidence did

not establish GM failed to act in good faith, which requires a wrongful demand enforced by coercion or intimidation. *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d 366, 369 (7th Cir.1978). We need not reach this issue, however. Even if we were to decide that the Dealer Act verdict was unsupported by the evidence (we do not mean to suggest that we would), it would not lessen the amount of damages GM must pay. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1305 (7th Cir. 1987). *Cf. Spanish Action Committee v. City of Chicago*, 766 F.2d 315, 321 (7th Cir.1985) (court declined to consider plaintiff's additional challenge where it would not increase the amount of recovery).

Liability was established under both the unconscionable practices claim and the Dealer Act claim (it was also established under the wrongful termination claim, but no damages were awarded under that claim, so the district court held the liability verdict for the wrongful termination claim was a "nullity"). The district court trebled all damages under § 218.01(9)(a) (App. 153), which GM does not challenge. Because we have already determined that the unconscionability claim remains intact, all damages, even as trebled, would still be recoverable even if we reversed as to the Dealer Act claim. Accordingly, we decline to reach GM's Dealer Act arguments.

### IV. Punitive Damages

■■■■ As the district court ultimately came to recognize, punitive damages were unavailable in the case that went to the jury. The Dealer Act only authorizes actual damages. *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 853 (M.D.Tenn.1974); H.R.Rep. No. 2850, 84th Cong. 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4596, 4602. And punitive damages are impermissible under the state law claims because damages may be trebled under § 218.01(9)(a). *John Mohr & Sons, Inc. v. Jahnke*, 55 Wis.2d 402, 198 N.W.2d 363, 367–68 (1972). The problem, though, according to GM, is that the district court came to this conclusion only after the harm had been done. Submitting the punitive damages claim at all when it was error to do so was prejudicial as a matter of law, says GM, and the remedy is a new trial. We disagree.

■■■■ GM relies on *Maskrey v. Volkswagenwerk Aktiengesellschaft*, 125 Wis.2d 145, 370 N.W.2d 815 (Wis.Ct.App.), *rev. denied*, 126 Wis.2d 518, 378 N.W.2d 291 (1985), and *Williams v. City of New York*, 508 F.2d 356 (2d Cir.1974). However, neither case holds that erroneously submitting the issue of punitive damages to the jury is prejudicial as a matter of law. In *Maskrey*, the Wisconsin appellate court concluded there had been no evidence to support the punitive damages claim and that it should not have been submitted to the jury. To remedy the error, the appellate court simply reversed the punitive damages award. 370 N.W.2d at 824. If anything, *Maskrey* condones the remedial action taken by the trial court here, namely, vacating the punitive damages award. In any event, it clearly does not compel a new trial.

In *Williams v. City of New York*, the court of appeals reversed a punitive damages award, reasoning in part that the jury's verdict rested on the trial court's erroneous jury instructions. Significantly, the court stated that insofar as the erroneous jury instruction was concerned, the error could be corrected on appeal, thus making a new trial unnecessary. The same is true here.

Submitting the punitive damages issue to the jury, although error, was harmless and was completely cured by vacating the award. By failing to identify any resultant prejudice—other than its claim, which we do not accept, that the submission of the punitive damages issue was prejudicial as "a matter of law"—GM in effect concedes the error was harmless. "Where it appears that [the] error in no way influenced the jurors, or only had a slight effect on them, the verdict and judgment are to be affirmed." *International Merger & Acquisition Consultants, Inc. v. Armac*, 531 F.2d 821, 823 (7th Cir.1976). There is no need for a new trial.

### V. Damages

GM launches a three-pronged attack against the damage verdict, arguing it was

based on incompetent testimony, unduly speculative and conjectural, and contrary to the weight of the evidence. The district court denied GM's motion for a new trial as to damages. It held:

> In reality the thrust of defendant's argument is that the damage award was excessive, not that the evidence presented precluded an award of damages. There is no question that substantial evidence was presented to justify an award of damages.
>
> \* \* \* \* \* \*
>
> The requisite foundation continues to convince this Court that Strachota [Willow's expert] was fully qualified to render a business valuation and an opinion as to lost profits from the facts and data to which he referred.
>
> \* \* \* \* \* \*
>
> The jury had before it lost sales, conduct of the defendant which related to those sales, together with other causal factors, including defendant's opportunity to attribute losses to factors other than the defendant's conduct.
>
> Damages are not rendered speculative or conjectural merely because they cannot be characterized with methodical precision. Here the plaintiff provided a reasonable basis for the computation. Defendant cross-examined Strachota at length and had full opportunity to present other causal factors which may have contributed to plaintiff's loss.

(App. 18–19).

■ GM challenges the competence of Willow's expert witness, focusing on his knowledge, methodology and findings. GM argues that Strachota was unfamiliar with GM's distribution system and that he failed to consider several factors relevant to any damage calculation, such as the effect of Willow's limited floor plan financing, an analysis of Willow's market, the effect of Willow's price increases which were made midway through its new fixed cost sales program, and Willow's own records of cancelled new car orders.

The decision to admit expert testimony is committed to the broad discretion of the trial court and its determination will be affirmed unless it is "manifestly erroneous." *Liquid Air Corp. v. Rogers*, 834 F.2d at 1308 (quoting *United States v. Lundy*, 809 F.2d 392, 394 (7th Cir.1987)). As we recently restated:

> The district court ruled that plaintiff had established an adequate foundation, and that any questions regarding Alexandor's methodology or particular area of expertise were more appropriately addressed during cross-examination. This was hardly error. Experience and knowledge establish the foundation for an expert's testimony; the accuracy of such testimony is a matter of weight and not admissibility.

*Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 441 (7th Cir.1988) (quoting *Liquid Air Corp. v. Rogers*, 834 F.2d at 1308).

In denying GM's motion for a new trial, the district court stated:

> Strachota ... relied on actual sales by plaintiff during those periods when sufficient vehicles were delivered to the plaintiff dealership by the defendant manufacturer. Strachota further relied on national and regional sales to determine sales trends and market conditions in his efforts to determine those sales which plaintiff should have experienced for the pertinent periods. The requisite foundation continues to convince this Court that Strachota was fully qualified to render a business valuation and an opinion as to lost profits from the facts and data to which he referred. This proper function of business valuation was well within the witness' expertise.

(App. 18–19).

The district court found a sufficient foundation for Strachota's testimony and left questions concerning his methodology, findings and expertise to cross-examination. "This was hardly error." *Liquid Air Corp. v. Rogers*, 834 F.2d at 1308.

■ Next, GM argues that Willow's evidence on damages was speculative and conjectural, and that in any event, the award of damages is against the weight of the evidence. On appeal, GM asks for a new trial as to damages. The authority to

grant a new trial is "confided almost entirely to the discretion of the trial court." *Spanish Action Committee v. City of Chicago*, 766 F.2d at 321. In ruling on a motion for a new trial, the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires. *Id.* Our review of a denial of a motion for a new trial is confined to those "exceptional circumstances" where there has been a "clear abuse of discretion." *Id.*

To arrive at a lost profits figure, Strachota took a baseline figure (e.g., for Chevrolet he used 1980 when Willow sold 309 cars) and adjusted it by national sales trends. This assumed that Willow would do at least as well as the national sales trends. (This was not without good reason. From 1979 to 1980, sales declined nationally by 18 percent while Willow's sales increased 83 percent.) GM complains that this method was "entirely hypothetical" and "speculative." To expose the formula's unreliability, GM applied it to Chrysler products which were unrestricted during this period. During cross-examination, GM showed this same damage formula, when applied to Willow's Chrysler products, showed losses, even though Chrysler's products were unrestricted. While this obviously weakened Willow's theory of damages, it did not preclude Strachota's testimony altogether. Rather, it goes to weight, not admissibility. *Bright*, 844 F.2d at 441.

Damages of course may not be speculative or conjectural, but neither are they required to be calculated with scientific precision or mathematical certainty. To calculate damages, Willow had to estimate the number of cars it would have sold—and thus what its profits would have been—had GM not engaged in unconscionable practices. It was completely reasonable to look to national sales trends for this information. In a similar case, an expert witness estimated the number of cars a dealer would have sold in the absence of discriminatory allocation by looking to the dealer's competitor. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510 (10th Cir.1976). There, the Tenth Circuit reject-

ed Nissan's argument that the record failed to support the dealer's assumptions as they concerned the number of cars that would have been sold absent the unlawful conduct. The court stated:

> [w]e are mindful that computations by experts cannot be based on conjecture or be unsupported by the record (citations omitted) [,] but, here, Stuart's damage calculations were based on records and data that were put into evidence through both testimony and exhibits, all of which were available to the jury during its deliberations.

*Id.* at 517–18. Likewise here, the jury reviewed and apparently accepted Strachota's testimony which was not "so insubstantial as to justify removing the damage question from jury consideration." *Marquis v. Chrysler Corp.*, 577 F.2d 624, 638 (9th Cir.1978). Moreover, any uncertainty regarding the number of cars Willow would have sold is attributable to GM's unconscionable practices. Thus, GM "is in an unfavorable position to complain of an uncertainty created by its own wrongdoing." *Randy's*, 533 F.2d at 518.

Finally, GM argues that the damage award is against the weight of the evidence or, in some respects, that it is unsupported by any evidence. GM reaches this conclusion by limiting Willow's damages to those instances where customer orders actually were cancelled. From 1981 through 1985, GM calculates that there were only 58 cancelled orders for new Chevrolets or Oldsmobiles. Limiting Willow's damages to its net profit per car for 58 cars drastically cuts the amount of damages, even using Willow's net profit per car figures. But Willow's theory of damages included more than just actual cancelled orders. GM's unconscionable practices, such as creating long delays in delivery and in failing to allocate to Willow a sufficient number of cars, caused Willow to stop taking customers' orders on several car lines. Because its back orders were not being filled, Willow concluded it was futile to continue to place additional orders which, if its past experience could prove as a guide, had virtually no chance of being filled. Willow's

damage formula attempted to account for those orders which were never placed.

■ We cannot accept GM's position on damages. First of all, while damages may not be speculative, a defendant whose own misconduct creates that uncertainty cannot complain that the damages are too speculative or conjectural. *See Randy's,* 533 F.2d at 518. Second, to recover damages under GM's theory, Willow would have had to continue to allow unwitting customers to order new cars knowing full well that the orders stood little chance of ever being filled. We decline to require obviously futile acts simply to bolster a litigation position.

This is not a case where the fact of damages is in serious doubt. Willow's testimony that it ceased taking orders altogether because of GM's unconscionable acts was unrebutted. Further, as discussed above, the national sales trends provided a reasonable estimate of the number of cars Willow would have sold but for GM's unconscionable practices. We find no abuse of discretion in denying GM's motion for a new trial under these circumstances.

## VI. Willow's Costs

■ Willow cross-appeals the district court's denial of its application for costs. Willow sought to recover its "expert witness costs" (totalling $26,504.96) and various other items such as copying and out-of-pocket expenses. All told, Willow's costs equalled $33,815.10. The district court, however, limited Willow's recoverable costs to those provided for in 28 U.S.C. § 1920. Obviously, given their size, the "expert witness costs" are the main item of concern. Generally, expert witness fees are controlled by 28 U.S.C. § 1821, "absent contract or explicit statutory authority to the contrary." *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385 (1987); *Adams v. Carlson,* 521 F.2d 168, 172 (7th Cir.1975). Willow points to § 218.01(9)(a) which provides in part, a "licensee suffering pecuni-

ary loss because of a violation by any other licensee of sub. (3)(a) ... 11 ... may recover ... costs including a reasonable attorney fee." Wis.Stat.Ann. § 218.01(9)(a).

Willow principally relies on *Bright, supra,* in arguing that it is entitled to all of its submitted costs. But its reliance is misplaced. In *Bright,* the defendants challenged the amount of expert witness fees taxed to them under the Wisconsin Fair Dealership Law. This court held "that in federal court [the Wisconsin Fair Dealership Law's] authorization of fee shifting of *actual* costs to a prevailing plaintiff ... is not restricted by the federal fee statute, [28 U.S.C.] § 1821." *Bright,* 844 F.2d at 444 (emphasis added). But in the case at hand, the relevant statute shifts only "costs," not "actual costs."[1] The difference is significant.

In *Bright,* we endorsed the district court's holding in *Esch v. Yazoo Mfg. Co.,* 510 F.Supp. 53, 59 (E.D.Wis.1981), and concluded that the Wisconsin Fair Dealership Law's "actual costs language authorize[d] a shift of the full cost of expert witness fees from the successful plaintiff to the defendant." *Bright,* 844 F.2d at 444. In *Esch,* the district court held the phrase "actual costs," as used in the Wisconsin Fair Dealership Law, provided for more than just ordinary taxable costs, reasoning that otherwise the Wisconsin legislature would have used the word "taxable" rather than "actual" to identify what costs were recoverable. *Esch,* 510 F.Supp. at 59. It follows, then, that the unqualified term "costs" under § 218.01(9)(a) permits no more than ordinary taxable costs as found in 28 U.S.C. § 1920. We find Willow's other arguments unpersuasive.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**1.** The statute in *Bright* provided "[i]f any grantor violates this chapter, a dealer may bring an action against such grantor in any court of competent jurisdiction for damages ... together with the actual costs of the action...." Wis. Stat.Ann. § 135.06.