**Shirley CARROLL, Plaintiff–Appellee,**

v.

**OTIS ELEVATOR COMPANY, Defendant–Appellant.**

No. 89–1641.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1989.

Decided Feb. 9, 1990.

---

Mark Glass, Kirby Palmer, Carr, Korein, Schlichter, Kunin & Montroy, East St. Louis, Ill., for plaintiff-appellee.

Harold A. Donovan, Donovan, Rose, Nester & Szewczyk, Richard E. Boyle, Gundlach, Lee, Eggmann, Boyle & Roessler, Belleville, Ill., for defendant-appellant.

Before EASTERBROOK and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This appeal arises from a diversity action in which a jury found the defendant Otis Elevator Company liable to pay the plaintiff Shirley Carroll damages in the amount of $42,899.51 for personal injuries she sustained while riding on an escalator manufactured by Otis.[1] As its sole basis for appeal Otis asserts that the trial court abused its discretion in qualifying one of plaintiff's witnesses as an expert. Because the witness was qualified to give testimony which assisted the trier of fact, we affirm.

## I.

On September 16, 1985 an unidentified child pushed the emergency stop button of the escalator on which the plaintiff, Shirley Carroll, was riding, causing her to fall and injure her knee. Carroll sued Otis Elevator Company, the manufacturer of the escalator, submitting strict liability in tort as a basis for recovery. The design defect asserted as part of this theory was that the escalator's "emergency stop button was unguarded and unreasonably attractive and operable by children."

In support of this assertion, the plaintiff called James Walker, an experimental psychologist, who testified that: red buttons attract small children, this button was unreasonably easy for a child to push, and

---

**1.** Suit was filed in the Circuit Court, Twentieth Judicial Circuit, St. Clair County, Illinois. Pursuant to 28 U.S.C. § 1441 the suit was removed to the United States District Court for the Southern District of Illinois which accepted jurisdiction of the case based on diversity of citizenship. 28 U.S.C. § 1332. A final judgment having been entered in the district court, we have jurisdiction under 28 U.S.C. § 1291.

that a covered stop button is less accessible to children than an uncovered stop button.

## II.

The defendant's sole complaint on appeal is that the trial court abused its discretion in permitting plaintiff's witness, James Walker, to testify as an expert on the subject of escalator design. Walker's testimony is deprecated because he allegedly was permitted to testify outside his area of expertise and because the subject of his testimony was not so distinctively related to some science as to be beyond the ken of the average juror.

Fed.R.Evid. 702 permits the trial court to admit the testimony of "a witness qualified as an expert by knowledge, skill, experience, training, or education" if his expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." The decision to admit expert testimony is committed to the broad discretion of the trial court and its determination will be affirmed unless it is "manifestly erroneous." *Bob Willow Motors Inc. v. General Motors*, 872 F.2d 788, 797 (7th Cir.1989), *citing Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1308 (7th Cir.1987).

### A.

■ Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony. *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984). Though Walker's area of expertise is experimental psychology, which concerns the study of human behavior and experience, his testimony was limited to whether the design features of this allegedly defective escalator stop button would cause young children to push it more than the stop buttons of other escalators. Walker was qualified to opine on this subject because his area of expertise involves human behavior and perception, and his testimony related solely to the attractiveness and accessibility of the stop button to children.

■ Walker's testimony concerned three basic points. First he testified brightly colored, red objects attract small children. This elevator's red stop button was more brightly colored than others he had observed. Hence he concluded this stop button was more attractive to small children than others. Next he testified that a covered stop button is less accessible to children than this uncovered one. Finally he remarked that the more difficult a button is to push the less readily it is actuated by a small child, concluding that this button was unreasonably easy to push. These opinions were simple observations which required their declarant to have only some limited understanding of a human's visual perception and manual dexterity. Walker, whose specialty is visual perception, was eminently qualified to testify as an expert in this case.

### B.

■ The plaintiff further asserts that even if qualified, Walker's testimony should not have been admitted because the subjects upon which he testified were within the ken of the average juror. Under Rule 702 expert opinion concerning matters about which jurors have general knowledge is admissible if the expert opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." Fed.R.Evid. 702 advisory committee's note *citing* 7 Wigmore § 1918.

While it is true that one needn't be B.F. Skinner to know that brightly colored objects are attractive to small children and that covered buttons or those with significant resistance are more difficult to actuate by little hands, given our liberal federal standard, the trial court was not "manifestly erroneous" in admitting this testimony and its judgment is accordingly AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

Those seeking to burlesque modern products liability law could do no better than to

examine this case. A department store's clerk gets on the up escalator. Suddenly it stops; because she was not holding the handrail she falls and injures her knee, which requires surgery. Her employer pays for medical care and the reduction in her wages because of time lost from work. In exchange for this assured payment without regard to fault under the workers' compensation law, the employer gets protection from liability in tort. So the clerk sues the manufacturer of the escalator, which does not have the workers' compensation bar, demanding money on account of the pain and suffering that workers' compensation does not recompense. Her theory is strict liability because the escalator's design made it unreasonably dangerous.

The escalator stopped because a prankster pressed the emergency stop button. Bad turn for the day accomplished, he fled and has not been identified. Escalators have stop buttons at each end. When clothing (worse, a finger) is pulled between the moving metal stairs and the grate or skirt panel, a press on the button may save life or limb. A person caught in an escalator is likely to panic, so the button must be prominent and easy to push—especially important because those least experienced with escalators, most likely to stick objects or fingers in the grate, and so most likely to get caught, are children. George R. Strakosch, *Vertical Transportation: Elevators and Escalators* 213 (2d ed. 1983). The buttons on this escalator are bright red to attract attention, a few inches off the floor to be within sight and reach of one entangled in the grate, recessed and covered by a half shield to prevent activation by falling packages and errant feet.

The buttons are not behind doors, which might obstruct access by panicked or handicapped riders.

The injured clerk speculated that a small child pressed the button, which she portrayed as an attractive nuisance. Her expert, an experimental psychologist, testified that the buttons have four faults:

- They are bright red, which attracts small children.
- They are close to the ground, so a small child notices them.
- They are uncovered, so a child may investigate them.
- They are activated by a touch light enough for a small child.

For reasons best known to itself, Otis Elevator Company has confined its appeal to the argument that the district judge should

have prevented the expert from testifying. I agree with my colleagues that the district judge did not abuse his discretion in admitting the testimony. Perceptual psychology (a part of experimental psychology) is not "junk science", and Professor Walker is no quack. He had a reasoned basis for his opinion, unlike the experts in *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1338–40 (7th Cir. 1989), and *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829–32 (D.C.Cir. 1988). See also E. Donald Elliott, *Toward Incentive–Based Procedure: Three Approaches for Regulating Scientific Evidence*, 69 B.U.L.Rev. 487 (1989).

In principle, a product could be unreasonably dangerous because its designers neglected to consider how children see things. A specialist in vision, illusion, and reaction is just the sort of person to assist on such questions. The manufacturer observes that expert testimony is inappropriate when the subject lies within the ken of laymen and insists that "everyone knows" red is attractive. Maybe, but much of the science of experimental psychology consists in demonstrating that what "everybody knows" is false. See Hans Wallach, *On Perception* (1976). The world looks flat but isn't. Lots of other things deceive the eyes. The lines separating the squares don't *look* parallel, but they are.

That Otis does not consult psychologists when designing emergency buttons, which it thinks an impenetrable obstacle to expert testimony on the point, may show only *why* its design came to be dangerous. In principle.

Allowing an expert to tell the jury how children react to color is not the problem. The clerk was entitled to aid in making her case—if she had one. Why should escalator design be a question for juries? No one supposes that courts would design escalators well, even with the help of many experts, if given that task. Why then ask them to identify defects after the fact? The *ex post* perspective of litigation exerts a hydraulic force that distorts judgment. Engineers design escalators to minimize the sum of construction, operation, and injury costs. Department stores, which have

nothing to gain from maiming their customers and employees, willingly pay for cost-effective precautions. Some persons will be injured when caught in the escalator; these costs go down as emergency stop buttons are easy to find and press. Others will be injured as escalators suddenly stop; these costs will go down as stop buttons are hard to find and press. Escalators move slowly, so stops rarely cause falls (and falls rarely cause serious injuries); passengers with poor balance or frail constitution may protect themselves by holding the handrails. Because the expected costs of stops are small, designers make buttons easy to find and press, to reduce the costs of the rarer, but much more serious, entanglements. The machines they have designed are safer than stairs. Strakosch, *Elevators and Escalators* at 211.

Come the lawsuit, however, the passenger injured by a stop presents himself as a person, not a probability. Jurors see today's injury; persons who would be injured if buttons were harder to find and use are invisible. Although witnesses may talk about them, they are spectral figures, insubstantial compared to the injured plaintiff, who appears in the flesh. Trained scientists put this out of mind and concentrate on the numbers, knowing that design decisions affect many persons other than this one, and that the interests of all must be held equally dear; *trained* is the key word, for it takes years to imbue the habit of abstract thought and supply the methods of statistical analysis that make this possible. Judges and jurors find the ways of other professions unnatural. Often they succeed in suppressing their habits and comparing the flesh-and-blood injury against potential losses; by and large juries resolve products liability cases sensibly. Yet no matter how conscientious jurors may be, there is a bias in the system. *Ex post* claims are overvalued and technical arguments discounted in the process of litigation. James K. Hammitt, Stephen J. Carroll & Daniel A. Relles, *Tort Standards and Jury Decisions*, 14 J. Legal Studies 751 (1985) (finding a substantial "deep pocket" effect in tort cases, holding type of injury constant). And the claims of crippled neighbors receive more weight than do potential injuries to be felt by passengers (and stockholders) in other states.

Even the many judges and jurors who put feelings aside and try to assess net social costs of particular designs may be unable to do so, because they will not have essential data. The costs of adequate data often exceed the stakes of the case. Worse, many cases go to judgment before the data can be gathered and analyzed. One of the more common and unnerving findings of social science is that well-meant demands for "more safety" in one aspect of product design may reduce total safety in unanticipated ways. Take for example the requirement that packages of drugs be hard to open. Caps resistant to children also may foil persons with arthritis or other disabilities, reducing their access to medicine. Parents who think that child-resistant caps are child-*proof* caps may unlock their medicine cabinets or put drugs in lower drawers; parents who find caps frustratingly hard to remove may leave bottles open. The net effect of the new packages may be less medication for the old and more poisoning of the young, the opposite of the intended effect. Some evidence suggests that this has happened. W. Kip Viscusi, *Consumer Behavior and the Safety Effects of Product Safety Regulation*, 28 J.L. & Econ. 527 (1985). Or take the laws and regulations requiring prescriptions for potent drugs. These make potentially dangerous drugs less readily available, but they also raise the cost of therapy (the patient must pay a physician as well as a pharmacist) and so reduce sales. Physicians may prescribe drugs that are more effective but also more dangerous than those sick persons would choose for themselves. The net effect of these changes may be more injuries from drugs—especially if the patients exceed the recommended dosages for their more potent medicaments. Again the data show an effect of this kind. Sam Peltzman, *The Health Effects of Mandatory Prescriptions*, 30 J.L. & Econ. 207 (1987). Counterintuitive effects of safety measures are common. Keeping a new product off the market (or raising its cost to pay for the changes that make it safer) may mean that older, and more dangerous, products stay in use longer. Peter W. Huber, *Liability: The Legal Revolution and its Consequences* 160–71 (1988), gives illustrations. Such information cannot be assembled and deployed in tort cases. Scholarly analysis follows rather than precedes the imposition of liability.

Because of these unanticipated effects, and because the legal system prefers the interests of identified plaintiffs to invisible future victims, manufacturers often do not (and ought not) modify their products in response to verdicts finding them "unreasonably dangerous". Otis won't (and shouldn't) color its emergency stop buttons blue, or even pink; it won't (and shouldn't) make them hard to push, or put them five feet off the floor where toddlers can't

reach them. Firms in this position may continue making and selling their wares, offering "tort insurance" to those who are injured, or they may take the goods off the market if the judgment bill becomes too high. Products liability law as insurance is frightfully expensive. First party insurance is cheaper than insurance through the legal system, because it avoids the need for legal fees and findings. of "fault". Workers' compensation laws provide ready compensation; employees could supplement it with insurance (their own, or provided by employers) without any of the unhappy byproducts of "insurance" derived from suits. Yet no one buys insurance against the pain accidents inflict, as opposed to medical costs and loss of income. George L. Priest, *The Current Insurance Crisis and Modern Tort Law*, 96 Yale L.J. 1521, 1546–47 (1987), explains why people do not buy (and markets do not supply) insurance against these losses, why efforts to create compulsory insurance foul up product markets. See also Richard A. Epstein, *Products Liability as an Insurance Market*, 14 J. Legal Studies 645 (1985). When the justification for liability reduces to insurance, the legal system should learn from the economic system.

Today's case illustrates other difficulties in the imposition of liability for defectively-designed products. The escalator complied with all design standards in force at the time it was built.* Why not treat this as conclusive—as more reliable (on average) than the opinions the legal system gives from hindsight? Now I'm acutely aware that building codes and even industry standards may reflect interest group politics or inattention to costs the industry does not bear rather than the best compromise between cost and safety, so that in principle Learned Hand was right to say that custom is no defense. *The T.J. Hooper*, 60 F.2d 737 (2d Cir.1932). See William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 131–39 (1988). There's that phrase again: *in principle*. Methods that can increase well-being when decisionmakers have full information, and use it as trained social scientists would, may have quite different effects in our second-best world. Telling juries that compliance with codes and standards does not count invites them to apply hindsight and to favor the interests of visible victims over invisible losers—those who must pay higher prices, who will be deprived of beneficial products, or who will be injured in turn if manufacturers change their designs to be jury-proof. Imperfect as they are, the incentives of department stores to acquire (and engineers to design) safe escalators work better than the alternatives the legal system can offer.

Had Otis presented on this appeal the argument that the evidence did not support liability, it would have had a strong point despite all of the doctrines that confine appellate review of jury verdicts. The firm's decision to bypass its best argument leaves us in the role of observers of state law. Although judges invented today's law of products liability, and federal judges in diversity cases led the war party, e.g., *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968), federal courts are not the forum for its revision. States followed cases such as *Larsen*, and *Erie* binds the

---

* Standards have required red stop buttons for many years. At the time this escalator was built they also required protection against "accidental" operation. An interpretation of that requirement provided that "[f]lush or recessed buttons would be considered protected against accidental operation." American Society of Mechanical Engineers, Elevator and Escalator Committee, *Interpretations 1980–1981* at 36. The latest rule, adopted in 1987, recognizes the benefits of deterring pranksters in addition to avoiding accidental activation. Section 805.-1b(1) of the American Society of Mechanical Engineers/American National Standards Institute, *Safety Code for Elevators and Escalators*, provides: "A red stop button shall be visibly located at the top and bottom landing on the right side facing the escalator. The operation of either of these buttons shall stop the escalator. It shall not be possible to start the escalator by these buttons. Remote stop buttons are prohibited. The buttons shall be covered with a transparent cover which can be readily lifted or pushed aside. When the cover is moved, an audible warning signal shall be activated. The signal shall have a sound intensity of 80 dBA minimum at the button location." Section 805.-1b(3) requires the button to be located below the handrail within a few inches of the deck.

federal bench to that decision. Federal judges have felt free to predict that states will impose liability where they have never done before; they lack freedom to predict that states will retrench. States, or the political branches of the national government, are the forum for change today. California, once the vanguard of ever-increasing liability, has reversed gear. Federal judges who apply state law often are in a good position to assess its consequences. I hope state judges who are tomorrow's pathfinders will take these comments as a skeptical report from the front. Cases such as today's ought to influence the way in which states appreciate the consequences of their own laws.