**Jackie WILSON, Plaintiff–Appellant,**

v.

**James K. WILLIAMS, Defendant–Appellee.**

No. 94–3620.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1995.

Decided May 8, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied July 15, 1996.

Steven H. Hoeft, Craig H. Zimmerman (argued), McDermott, Will & Emery, Chicago, IL, for Plaintiff-Appellant.

James E. Ryan, Office of the Attorney General, Chicago, IL, Michael David Jacobs, David S. Meyerson (argued), Office of the State's Attorney of Cook County, Chicago, IL, Harold E. McKee, III, Sedgwick, Detert, Moran & Arnold, Chicago, IL, Terry L. McDonald, Office of the State's Attorney of Cook County, Federal Litigation Division, Chicago, IL, for Defendant-Appellee.

Before WOOD, JR., COFFEY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case, now before us for the second time, arose out of an altercation in the Cook County Jail on June 23, 1988. Plaintiff-appellant Jackie Wilson alleged that on that date, while he was held in the jail as a pretrial detainee, a corrections officer, defendant-appellee James K. Williams, attacked him without provocation. A fight and wrestling match ensued; Wilson claimed that after the two were separated and Wilson was restrained by other corrections officers, Williams continued to beat and kick him. Wilson also claimed that later that same day Williams again attacked him while Wilson was restrained near a security post in a different area of the jail. Wilson brought suit under 42 U.S.C. § 1983, asserting he was "punished" while a pretrial detainee without a prior adjudication of guilt, in violation of the Fourteenth Amendment.

For his part, corrections officer Williams admitted that an altercation occurred, but denied starting the fight and asserted that any force used was justified under the circumstances. Just exactly what those circumstances were, however, is quite unclear. Following an initial period of discovery, the district court granted the defendants'[1] summary judgment motion, but this decision was reversed on appeal. This court found that Wilson's affidavits created genuine issues of fact as to "who started the fight, whether Wilson provoked the fight, whether the fight continued after Wilson was restrained, whether [Williams' fellow officer] Cavallone was involved in the altercation at all, and whether Williams hit Wilson outside the security post." *Wilson v. Williams,* 997 F.2d 348, 351 (7th Cir.1993).

On remand, after further discovery, a jury trial was held. Who started the fight and the exact events that led to it remained the primary issue. All agree that the altercation basically took place in the dayroom of Tier E–1, a disciplinary tier of the jail.[2] Beyond this simple fact, and despite several stipulations, the stories diverge a great deal. To briefly summarize, on the afternoon of the incident Wilson and a fellow pretrial detainee, Aryules Bivens, were watching television in the dayroom. Meanwhile, officer Williams, who did not know or have any prior contact with Wilson, was called to the tier to escort another inmate, Johnnie Walker Redd, to his cell. Redd was variously described by inmates and staff as "antisocial," "obnoxious," and a "troublemaker"; it was also suggested that he feared violence from the other inmates because of his aggravating behavior.

Responding to the call for an escort, Williams met Redd at the designated security area near the dayroom. The two proceeded towards Redd's cell, intending to pass through the dayroom to reach the cell corridor just beyond it. Redd entered the day-

room, with Williams following behind. Wilson claims Redd motioned to him, apparently to help him carry some property, so Wilson approached. Bivens also started walking toward Williams and Redd. As Redd neared the open gate on the other side of the dayroom, officer Williams claims he heard either Wilson or Bivens say "get the mother fucker," and an attack ensued. Williams claims he pushed Redd through the gate and told him to run to his cell; meanwhile Bivens hit Williams then broke off quickly to follow Redd, slamming the sliding gate shut behind him and leaving Wilson to fight Williams. Fisticuffs and wrestling between Williams and Wilson ensued. (Corrections officers at the facility carry no weapons, and none were involved here.) Other corrections officers soon responded and found Williams pinned down by Wilson after several blows had been struck by each.

Wilson's story, supported in part by Bivens, was predictably much different. Wilson claims that after Redd motioned to him, he simply followed Williams in line as the group proceeded across the dayroom. Bivens then stepped between Redd and Williams in the line as they neared the open gate to the cell corridor. Purportedly seeking to exploit Redd's fears or otherwise provoke him, Bivens crossed the threshold from the dayroom then immediately reached behind his back and slammed the gate shut. This left Bivens and Redd alone on the cellblock side of the gate, and Williams and Wilson alone on the dayroom side. Wilson claims that at that point he laughed, and that Williams, seeing this and becoming embarrassed, grabbed him and threw him to the floor in response. The fight then proceeded from there in the same fashion as related above.

In addition to the dispute over how the altercation started, testimony also differed as

---

1. Two defendants were named in the original complaint. In addition to Williams, Thomas Cavallone, another corrections officer serving with Williams on the day of the altercation, was also sued. Cavallone was voluntarily dismissed before trial.

2. The stipulations before trial included a statement that Wilson was not housed on Tier E–1 for

disciplinary reasons. It was suggested at trial that his presence there was simply a result of overcrowding elsewhere in the facility, though "elsewhere" may include areas reserved for detainees with behavioral problems. In any event, Tier E–1 is regarded as the area reserved for the most dangerous or violent detainees.

to how it ended. On the one hand, Wilson claims that after he was pulled from Williams and restrained by other officers, Williams advanced on him again, beating and kicking him until ordered to stop by a superior. Bivens told a similar story, though much of his testimony was wildly exaggerated and did not match Wilson's. Wilson also asserts that he was injured from a fall down three or four stairs after being pushed by officers escorting him away, and that Williams again attacked him while he stood restrained near another security post waiting to be taken for medical treatment. Williams, on the other hand, supported by four other officers, claimed that Wilson continued flailing about as the officers attempted to handcuff him, and that he had no further contact with Wilson after the two were separated. Both Wilson and Williams required medical attention for minor injuries.

At the instructions conference, Wilson objected to the only instruction regarding substantive law, entitled "Elements of Section 1983 Claim." This instruction, developed by the trial court, was as follows:

> In order to prove his claim under Section 1983 of Title 42 of the United States Code, the plaintiff must establish by a preponderance of the evidence each of the following elements:
>
> (1) the defendant deprived the plaintiff of a constitutional right, and in so doing, acted deliberately or with callous indifference, evidenced by an actual intent to violate plaintiff's constitutional rights or reckless disregard for his rights;
>
> (2) the defendant acted under color of the authority of the state of Illinois;
>
> (3) that the defendant's acts were the legal cause of the plaintiff's damages.
>
> . . . .
>
> With regard to the first element, the constitutional right at issue in this case is the plaintiff's Fourteenth Amendment right, as a pretrial detainee, not to be punished. The state has a right to hold a pretrial detainee in custody, but the state may not actually punish that person prior to an adjudication of guilt in accordance with due process of law. "Punishment" is

a deliberate act intended to chastise or deter. The plaintiff claims that the defendant's use of excessive and unnecessary force against him amounted to punishment.

> In order to prove that the defendant used excessive and unnecessary force, the plaintiff must prove by a preponderance of the evidence:
>
> (1) some harm, that
>
> (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was
>
> (3) objectively unreasonable in light of the facts and circumstances at the time.
>
> If the plaintiff fails to prove any one of these elements, you must find for the defendant.
>
> Some of the things you may want to consider in determining whether the defendant used excessive force are (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response.
>
> In making and carrying out decisions involving the use of force to restore order in the face of a jail disturbance, jail officials must take into account the threats the unrest presents to detainees and correctional officials alike, in addition to the possible harms to detainees against whom force might be used.
>
> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The nature of reasonableness must embody allowance for the fact that correctional officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> This reasonableness inquiry is an objective one: the question is whether the offi-

cer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

If you find that the plaintiff has proven his claim, you must then consider the defendant's defense, that he acted in good faith and thus is not liable.

. . . .

If, after considering the scope of the discretion and responsibility generally given to correctional officers in the performance of their duties, and after considering all of the circumstances of the case as they would have reasonably appeared at the time, you find from a preponderance of the evidence that the defendant had a reasonable and good faith belief that his actions would not violate the plaintiff's constitutional rights, then you cannot find him liable even if the plaintiff's rights were in fact violated as a result of the defendant's good faith action.

. . . .

Wilson argues the trial court's instruction misstates the applicable law in three separate ways, all linked to a single fundamental defect: the jury was told to judge Williams' intent according to objective factors, without regard to his subjective, actual intent. Specifically, Wilson asserts that the instruction directed the jury "to disregard his actual intent"; it also "afforded Williams a 'good faith' defense to which he could not possibly have been entitled"; and it "repeatedly use[d] the adjectives 'excessive' and 'unnecessary,' [which] impermissibly heightened the amount of force Wilson was required to prove to prevail."

The trial court considered and overruled Wilson's objections, noting they were preserved. The instructions were then read to the jury, which returned a verdict for officer Williams. A motion for a new trial on the basis of alleged errors in the jury instruction was denied, and this appeal followed.

## ANALYSIS

### A. Standard of Review

 Review of jury instructions is limited. We construe jury instructions in their

entirety, seeking to determine if, as a whole, they were sufficient to inform the jury correctly of the applicable law. *See Maltby v. Winston,* 36 F.3d 548, 560 (7th Cir.1994) (citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). In this review we avoid fastidiousness and inquire only whether the correct message was conveyed to the jury reasonably well. *See Wilk v. American Medical Ass'n,* 719 F.2d 207, 218 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). We will reverse only if it appears that "the jury was misled ... [and its] understanding of the issue was seriously affected to the prejudice of the complaining party." *Stachniak v. Hayes,* 989 F.2d 914, 920 (7th Cir.1993) (quoting *Northbrook Excess & Surplus v. Procter & Gamble,* 924 F.2d 633, 638 (7th Cir.1991) (citations omitted)). Our analysis, then, is in two parts. First we determine if the instruction misstates or insufficiently states the law, and, if so, we then determine whether the error has prejudiced the complaining party.

### B. The Jury Instruction

#### 1. Excessive Force Standard for Pretrial Detainees

Wilson's disagreements with the trial court's instruction are not surprising given the paucity and ambiguity of case law regarding the standards applicable to a pretrial detainee's § 1983 claim of excessive force and the trial court's struggle to accommodate the different theories of the parties at trial. The Supreme Court specifically rejected the "notion that all excessive force claims brought under § 1983 are governed by a single generic standard," *Graham v. Connor,* 490 U.S. 386, 393, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989), and instructed that "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id.* at 394, 109 S.Ct. at 1870. Once identified, the specific right at issue in turn determines the appropriate analytical lens through which facts are to be viewed. Accordingly, in cases involving an arrest, investigatory stop, or other "seizure" of a free citizen, the "objec-

tive reasonableness" standard of the Fourth Amendment is applied. *Id.* at 395–97, 109 S.Ct. at 1871–72; *Tennessee v. Garner,* 471 U.S. 1, 7–20, 105 S.Ct. 1694, 1699–1706, 85 L.Ed.2d 1 (1985). At the other end of the spectrum, in cases involving convicted prisoners, the "cruel and unusual punishment" or "unnecessary and wanton infliction of pain" standard of the Eighth Amendment is used. *Whitley v. Albers,* 475 U.S. 312, 318–22, 106 S.Ct. 1078, 1083–86, 89 L.Ed.2d 251 (1986).

 Between the status of free citizen and convicted prisoner lies the "pretrial detainee," protected by the due process clause of the Fourteenth Amendment. Jurisprudence surrounding this clause makes clear that such individuals, who though detained have not been found guilty of any crime, may not be "punished" by the state in any way. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979). Since this protection necessarily extends beyond the prohibition of merely "cruel and unusual" punishment, pretrial detainees must arguably be afforded a higher standard than that provided by the Eighth Amendment. *See Bell,* 441 U.S. at 537, 99 S.Ct. at 1873; *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (due process protections are "at least as great" as those afforded by the Eighth Amendment). This is so at least for claims that deal with things other than conditions of confinement. *See Bell,* 441 U.S. at 537, 99 S.Ct. at 1873; *Boswell v. Sherburne County,* 849 F.2d 1117, 1121 n. 4 (8th Cir.1988) (outlining the conflicting standards of the various courts of appeals for conditions of confinement claims), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989).

Whether the standard for excessive force claims is the "reasonableness" standard of the Fourth Amendment, or some other intermediate standard, the Supreme Court has declined to say. *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (1989). A variety of approaches are used in other circuits. *See, e.g., United States v. Cobb,* 905 F.2d 784, 788–89 (4th Cir.1990), *cert. denied,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991) (Eighth Amendment standard); *Valencia v. Wiggins,* 981 F.2d 1440, 1443–47 (5th Cir.)

(Eighth Amendment standard, at least in prison security context), *cert. denied,* 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); *Telfair v. Gilberg,* 868 F.Supp. 1396, 1410–12 (S.D.Ga.1994) (intermediate standard devised by district court); *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* § 4.20 (1995) ("excessive force cases should be resolved by use of the same standard as applied to fourth amendment cases (reasonableness)").

In this circuit, we have recognized the insufficiency of the Eighth Amendment's protections for pretrial detainees and have held that to prevail on a Fourteenth Amendment claim, a plaintiff must prove that the defendant(s) "acted deliberately or with callous indifference, evidenced by an actual intent to violate [the plaintiff's] rights or reckless disregard for his rights." *Anderson v. Gutschenritter,* 836 F.2d 346, 349 (7th Cir.1988) (citing *Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1094 (7th Cir.1986)). We have also stated that "[m]ost of the time the propriety of using force on a person in custody pending trial will track the Fourth Amendment: the court must ask whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them." *Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir.1990). We also noted, however, that because the due process clause does not proscribe negligence or even gross negligence, *id.* (citations omitted), "the search for 'punishment' cannot be wholly objective." *Id.* This view is supported by the definition of "punishment" as "a deliberate act intended to chastise or deter," *Salazar v. City of Chicago,* 940 F.2d 233, 239 (7th Cir.1991) (citations omitted), but is also limited by the fact that "[c]riminal recklessness is a proxy for intent." *Id.* (citing *Archie v. City of Racine,* 847 F.2d 1211, 1220 (7th Cir.1988) (en banc)).

 In this case, the district court instructed the jury with the appropriate definition of punishment and outlined the "actual intent or reckless disregard" standard of *Anderson.* While not challenging this standard, Wilson faults the explanation of it, which followed. After reciting that the plaintiff claimed that the corrections officer's "use

of excessive and unnecessary force against him amounted to punishment," the court instructed that:

> In order to prove that the defendant used excessive and unnecessary force, the plaintiff must prove by a preponderance of the evidence:
>
> > (1) some harm, that
> >
> > (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was
> >
> > (3) objectively unreasonable in light of the facts and circumstances of the time.
>
> If the plaintiff fails to prove any one of these elements, you must find for the defendant.

Wilson argues that this "objective" standard is impermissible and takes issue with the court's later comment that: "This reasonableness inquiry is an objective one: the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." While this sentence, lifted verbatim from *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872–73, was intended to apply to excessive force claims raised explicitly under the Fourth Amendment, we do not consider it, nor the test which it espouses, inappropriate in the context here.

The evidence in the case was often conflicting, and the ultimate issue of actual intent remained unproven. In such circumstances, and in view of the fact that "recklessness" may be a proxy for intent, we believe a jury may properly rely on objective factors to arrive at their determination of that intent. The fact that the exploration of these issues in the Fourteenth Amendment context cannot be "wholly objective" does not mean that the test must be "wholly subjective," either. In the instruction at issue the district court also provided the jury with a variety of factors that could be used in their determination. These included:

(1) the extent of the injury suffered;

(2) the need for the application of force;

(3) the relationship between the need and the amount of force used;

(4) the threat reasonably perceived by the responsible officials; and

(5) any efforts made to temper the severity of a forceful response.

While these factors, too, are generally relied on in the Fourth Amendment excessive force context, *see Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992) (citing *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085), we believe they were appropriate here as factors by which to infer an intent to punish. This part of the instruction, then, seen as a whole, conveyed the law to the jury reasonably well.

### 2. Good Faith Defense

Another wrinkle in this case which the district court apparently struggled with, as do we, is the fact that the parties' competing theories at trial implicated different legal standards. Simply put, Wilson claimed he was the subject of an unprovoked attack by the corrections officer, while Williams argued that it was he who had been attacked, and that he was therefore acting in self-defense in the prison security context. While the Fourteenth Amendment excessive force standard is clearly appropriate in the former situation, it is arguably supplanted in the latter. *See Valencia*, 981 F.2d at 1446 (adopting an Eighth Amendment standard for prison disturbances).

Considering the fact that convicted prisoners and pretrial detainees are held together in correctional facilities, we recognize the impracticality of separate standards for these two groups in the context of a jail disturbance. Indeed, the Supreme Court has stated that there is no reason to distinguish between the two groups in reviewing challenged security practices because there is no basis to conclude that pretrial detainees pose any lesser security risk than convicted inmates. *Bell*, 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28. We may therefore assume, without deciding, that in the prison security context, the applicable standard for excessive force claims is provided by the Eighth Amendment, as explained in *Whitley* and *Hudson*: whether the measure taken inflict-

ed unnecessary and wanton pain and suffering depends on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999 (citing *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085).

Whether this standard was considered by the trial court for its instruction, or whether the court described good faith as a defense to objective reasonableness, is unclear. In any event, after setting forth the excessive force standard as explained above, the instruction went on to provide a good faith defense:

> *If you find that the plaintiff has proven his claim,* you must then consider the defendant's defense, that he acted in good faith and thus is not liable.
>
> . . . .
>
> If . . . you find from a preponderance of the evidence that the defendant had a reasonable and good faith belief that his actions would not violate the plaintiff's constitutional rights, then *you cannot find him liable even if the plaintiff's rights were in fact violated* as a result of the defendant's good faith action. (Emphasis supplied.)

■ In our view this instruction in this difficult area constitutes error. The jury was first instructed to determine, through objective means, whether the prohibited punitive intent was present, but then was told that even if this was found, a reasonable good faith punitive intent would excuse it. We find this fairly confusing and assume the jury did, too. This instruction, at least without a prior finding that a jail disturbance in fact existed, impermissibly creates another objective bar to Wilson's Fourteenth Amendment claim. Using this standard, if a jury believes a pretrial detainee has in fact been "punished" (outside a jail disturbance context), they are still prevented from finding liability if the punishing officer believed the force was lawful or simply did not know any better. Under the standards of the Fourteenth Amendment, which prohibits *any* "punishment," such a result is impermissible.

### 3. Use of Terms "Unnecessary" and "Excessive"

■ Wilson asserts that the jury instruction repeatedly used the terms "unnecessary" and "excessive," and that this usage heightened his burden to that of an Eighth Amendment claim. We believe the use of these terms, while not ideal in a Fourteenth Amendment context, is a minor difficulty and understandable given the objective search for a criminally reckless state of mind. We do not believe their use in this case misled the jury.

### C. Prejudice

■ We now turn to the second part of our inquiry, which requires a determination whether the error in the instruction misled the jury to the prejudice of the complaining party. *See Northbrook,* 924 F.2d at 638. In *Lester v. City of Chicago,* 830 F.2d 706 (7th Cir.1987), a Fourth Amendment excessive force case, we determined that if the jury believed all the appropriate testimony of the plaintiff, it could have concluded that the defendant officers in that case used more force than was reasonably necessary under the circumstances. *Id.* at 714. Due to improper elements in the jury instruction, however, the jury might still have found against the plaintiff. *Id.* This case presents a parallel scenario. The jury could have believed facts sufficient to find that Wilson proved the elements of his Fourteenth Amendment claim, yet still found for Williams because of the inappropriate good faith defense. In *Lester,* we held that such an error could not be harmless. *Id.* The same conclusion is compelled here. While we will not guess as to what the jury actually believed in this case, we hold that the error in their instruction was not harmless, and therefore reverse and remand for a new trial.

REVERSED AND REMANDED.