Keiphan J. BERRY, Plaintiff–Appellant,

v.

Robert A. BROWN, individually and in his capacity as a Porter County Police Officer; County of Porter; and Porter County Police Department, Defendants–Appellees.

No. 97–2439.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1998.

Decided April 9, 1998.

Ivan E. Bodensteiner (argued), Valparaiso, IN, for Plaintiff-Appellant.

Elizabeth A. Knight (argued), Knight, Hoppe, Fanning & Knight, Des Plaines, IL, Gwenn R. Rinkenberger, Valparaiso, IN, for Robert A. Brown, Tim Emmons and John P. Kuehl.

Gwenn R. Rinkenberger, Valparaiso, IN, for Porter County and Porter County Police Department.

Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.

Terence T. EVANS, Circuit Judge.

Does a police officer violate the Equal Protection Clause when, in the midst of a heated exchange, he tells a citizen to go back where he came from? What if the citizen is black, the place he came from has a large black population, and the place he is asked to leave is lily-white? Keiphan Berry, the citizen, thought the answer was "yes" so he filed a § 1983 suit against the officer, Robert Brown. But a jury didn't see it his way, and while it looks to us like they simply believed Brown's story—that he lacked discriminatory intent when he told Berry to leave town— Berry tries to convince us that an incorrect jury instruction was the real culprit.

Berry is a 24–year–old black man who lives in Gary (Lake County), Indiana, an area with a significant black population. On a spring day in May of 1994 Berry ventured into neighboring Porter County, where less than 1 percent of the population is black. Berry made the trip while doing his job as a ChemLawn sales rep. The trip, as we will explain, ended up in a lawsuit.

While its offices were in Lake County, ChemLawn evidently felt that the grass was greener on Porter County's side of the fence, so it used telemarketers to cold-call Porter County homeowners and ask if they were interested in lawn care services. If a response was favorable, the lead would be given to a sales rep, like Berry, who would be dispatched to the home to inspect the lawn.[1] The lawn inspection was supposed to take place during the day, and the rep was then supposed to come back or call in the evening and try to sell the ChemLawn services.

On May 19 Berry's boss gave him some Porter County leads, one being a home at 2852 Hearthstone Street in Valparaiso. When Berry arrived at that address he did his inspection—and also engaged in the non-lawn-related activity of peeking into the house. Unbeknownst to Berry, an old woman—the grandmother of the homeowner who consented to the lawn inspection—was inside the house babysitting for a pair of 3–year-olds. Grandma saw the peek and called 911 to report a Peeping Tom.

The police dispatcher sent out a call—with a description of Berry and his car, a red 1990 Ford Mustang. The car was Berry's personal vehicle, without "ChemLawn" markings of any kind. Although several Porter County sheriffs' deputies, including Brown, responded, Berry finished his lawn inspection and left before they got to the house. He inadvertently eluded the police until around noon, when Sergeant John Kuehl pulled him over and radioed in the news.

Berry explained why he was at the Hearthstone home, but Kuehl took Berry's license anyway and went back to his cruiser to check it out. At that time, Brown, who heard Kuehl's call on the radio, arrived and went to talk with Berry. As they were talk-

---

1. A lawn inspection involved a measurement of the lawn (with a measuring wheel) and the performance of ChemLawn's "14–point analysis," a brief examination of the lawn for color, insects, turf density, weeds, and overall condition. According to Berry, a typical lawn inspection took 5 minutes.

ing, two more officers, Tim Emmons and David Miller, arrived.

What happened next (and why) was the key issue at trial, and naturally we have multiple versions of the story. According to Brown (and Emmons, who had the best vantage point), Berry began complaining about the stop. He told the police that he was stopped only because he was black and that he hated Porter County because every time he went there cops harassed him. Brown says he was offended by these comments, and after he found out Berry was from Gary he said, "If you don't like it here, go back to Lake County."

In Berry's version of the story he didn't complain about the stop. He says that, out of the blue, Brown asked him where he was from and immediately said, "This is Porter County; you need to go back to Lake County where you belong." Backing up Berry's version is a third-party witness, Elizabeth Gingerich, a local lawyer who says she overheard an angry Brown tell Berry, "You're from Lake County, go back there and stay there." Gingerich, however, did not know that a 911 call prompted the stop.

By the time this exchange was over, Kuehl had returned, and Berry gave him the Chem-Lawn leads to support his story. After seeing these, Kuehl decided to let Berry go, but before the police departed, Gingerich approached and asked to talk to Berry. While talking with her, Berry realized that the police still had his list of leads, and he went over and asked for them. According to Berry, Brown got angry and threatened to arrest him if he didn't leave. Gingerich jumped in to defend Berry, but before it got truly ugly the other officers calmed things down. Afterward Brown gave Berry the leads and according to Berry apologized, saying, "I'm sorry, no hard feelings. Hope there's no hard feelings."

Berry took off and left Porter County but he didn't forget the incident, and he soon sued Brown, Emmons, Kuehl, Porter County, and the Porter County Police Department. He alleged constitutional violations (of the Fourth, Thirteenth, and Fourteenth Amendments) under § 1983, contract and discrimination claims under 42 U.S.C. § 1981, and an assortment of other claims as well. The defendants moved to dismiss, and while Judge Lozano in the district court dismissed a few claims, he left Berry with a Fourth Amendment claim—for being stopped without probable cause-against all the defendants, and a Fourteenth Amendment claim (and related § 1981 claims and an Indiana constitutional claim)—for being told to go back to Gary—against Brown and Porter County (for failure to train).

At trial, after Berry finished putting on his case, the defendants moved for judgment as a matter of law, and Judge Lozano dismissed the Fourth Amendment claim. This left Berry with a shot at the jury only on the Fourteenth Amendment claim against Brown and Porter County.

During a jury instruction conference Berry objected to the instruction (# 19) the judge proposed giving on his remaining claim, which required him to prove that "Brown *ordered* [him] to leave Porter County because of his race." He thought he shouldn't have to prove that he was *ordered* to leave because something less than an *order* was actionable. Even after admitting that his theory at trial was that he was *ordered* out of Porter County, Berry proposed alternative language; that Brown was liable if he "*suggested* that [Berry] leave Porter County or did not belong there because of his race." Judge Lozano decided to stick with instruction # 19. The jury decided against Berry.

■ On appeal, Berry seeks a new trial, directing his primary efforts at instruction # 19.[2] So, we must look to see if the instruc-

---

2. Berry also challenges instruction # 20, which reads, "Verbal abusive language, including racial remarks by the police, do not, without more, violate the Constitution." He objected to it at the jury instruction conference, saying that racially abusive remarks could amount to an order, but he doesn't press this argument on appeal, instead electing to raise new ones—that it's in-

correct and/or irrelevant. Because we interpret Federal Rule of Civil Procedure 51 to deny review to all jury instruction arguments, like Berry's here, that weren't specifically raised before the district court, Bob Willow Motors, Inc. v. General Motors Corp., 872 F.2d 788, 794 (7th Cir.1989), and we do not recognize plain error review of the instructions in civil cases, Deppe v.

tion incorrectly or insufficiently stated the law applicable to this dispute and, if it did, whether a new trial is required. *Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir.1996).

■ Berry says instruction # 19 was incorrect because, by confining the actionable conduct to an *order* to leave, it impermissibly narrowed the definition of a denial of equal protection and a violation of § 1981.[3] However, the way we see it he isn't really complaining that instruction # 19 is incorrect, for he admits that its substance is correct—that if an officer *orders* a citizen to leave a municipality because of his race he violates the Equal Protection Clause. Instead, Berry's gripe is that the instruction insufficiently stated the applicable law because it didn't state that a *suggestion* that he leave, something less than an order, could also make Brown liable.

So, was Judge Lozano required to give the broader *suggested* instruction to sufficiently state the law? We are aided in this inquiry by the principle that a party is entitled to a jury instruction (or in this case, a broader jury instruction) only when he has both legal and evidentiary support for it. *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir.1989); *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 428 (Fed.Cir.1986). Here, Berry's legal theory appears to be one of verbal police harassment as opposed to the exclusion theory embodied in instruction # 19. While this legal theory may have merit, *see Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir.1989), *overruled on other grounds, Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir.1994) (equal protection claim); *Mahone v. Waddle*, 564 F.2d 1018, 1028 (3d Cir.1977) (§ 1981 claim), factual support for it is a sticking point.

Even ignoring the fact that Berry admitted in the instruction conference that his theory was that he was *ordered* to leave Porter County, his evidence all points to an *order*, not a *suggestion*. Berry's own story

portrays Brown as an angry officer who tells Berry, out of the blue and in no uncertain terms, to go back where he belonged. Gingerich's story is similar. So, instruction # 19 covered Berry's theory and all his evidence, *see Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir.1992), but did that mean it sufficiently stated the applicable law?

Before we answer this question we first have to ask, "If Berry got an instruction that covered his theory of the case and all his evidence, what's his beef?" Good question. We find a clue to this mystery in a statement Berry's counsel made to the jurors during closing argument, telling them that Brown's version of the statement could also violate the Equal Protection Clause and § 1981. Also, recall that Brown's version of the statement was a reply to Berry's complaints, a *suggestion* that if he didn't like Porter County he should leave it. Once we combine these two clues, we can see what Berry was up to when he tried to broaden instruction # 19; he was trying to play capture the flag with Brown's story, using it against him.

Unlike Berry's evidence, Brown's statement truly was a *suggestion,* and therefore it wasn't covered by instruction # 19. However, showing evidence of a *suggestion* is only half the battle, for we still have to find sufficient evidence that the suggestion was made with discriminatory intent-made because of *Berry's race*—before the instruction would have to be considered. *Farrell*, 866 F.2d at 1297. Brown's *suggestion* to leave Porter County makes sense only if viewed in context, where Berry incessantly complained about being stopped because he was black and complained about Porter County, offending Brown and causing him to reply to Berry's complaints with the *suggestion.* Unfortunately for Berry, this scenario doesn't create any inference of discriminatory intent. The *suggestion* itself is facially neutral and, when combined with the se-

---

Tripp, 863 F.2d 1356, 1361–62 (7th Cir.1988), Berry forfeits review of instruction # 20.

**3.** Berry adds an argument to his objection at the conference; he says that another part of instruction # 19, which required him to prove that Brown's "order carried a threat of use of police

authority to enforce such order," was also incorrect. Besides forfeiting the argument, see supra note 2, this argument adds nothing to his earlier objection because we think a threat of enforcement goes hand in hand with an order from a uniformed police officer.

quence of events-Berry's complaints followed by Brown's angry reply-the only reasonable conclusion is that Brown reacted out of anger without intending to discriminate.

Even if that weren't the case, Berry could have suffered no real harm growing out of the instructions in the eyes of the jurors. The key issue here wasn't whether Brown ordered Berry to leave or suggested that he leave, it was whether Brown said what he said because Berry was black. Because of the marginal importance of the characterization of Brown's statement—the word "order" was just a label for Brown's conduct—we doubt that it mattered enough to prejudice Berry. The instruction as given certainly gave Berry a fair shot at winning his case if he could prove that his race motivated Brown to act as he did. The jury was obviously not convinced. Therefore, the judgment is

AFFIRMED.