James **JENKINS**, Plaintiff,

v.

James **WILSON** and Tim **Bengston**, Dane County Deputy Sheriffs,[1] Defendants.

No. 05–C–609–C.

United States District Court, W.D. Wisconsin.

May 22, 2006.

---

1. The caption has been updated to reflect the defendants' proper names as recited in defendants' motion for summary judgment.

James Jenkins, Pro se.

John M. Moore, Bell, Gierhart & Moore, S.C., Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief in which plaintiff James Jenkins, an inmate at the Dodge Correctional Institution in Waupun, Wisconsin, contends that respondents violated his constitutional rights under the Eighth Amendment of the United States Constitution when they physically assaulted him without provocation while he was incarcerated at the Dane County jail in Madison, Wisconsin.

The case is before the court on defendants' motion for summary judgment, to which plaintiff has not responded. Even though defendants' motion is unopposed, it is necessary to examine the facts proposed by defendants to determine whether they are entitled to summary judgment on each of plaintiff's claims. Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must view all facts and draw all inferences from those facts in the light most favorable to the non-moving party. *Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 573 (7th Cir.2003). From the undisputed facts of this case, a jury could reasonably infer that defendants used excessive force against plaintiff. Consequently, defendants' motion must be denied.

Because defendants' motion is unopposed, the following facts are drawn solely from defendants' proposed findings of fact.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff James Jenkins is a former inmate of the Dane County jail in Madison, Wisconsin and a current inmate of the Dodge Correctional Institution in Waupun, Wisconsin.

Defendants James Wilson and Tim Bengston are deputies employed by the Dane County Sheriff.

### B. *August 22, 2005*

On August 22, 2005, defendants Bengtson and Wilson were on duty in the 6 West Wing of the Dane County jail. At approximately 9:45 p.m., the deputies began a physical inspection of the cellblock to check on the welfare of the inmates. During the inspection, Deputy Bengtson conducted a random search of plaintiff's cell.

During the search, defendant Bengston inspected a bin in which plaintiff stored his personal items. Plaintiff was in the jail's

dayroom at the time, and objected loudly to defendant Bengston's inspection, asserting that defendants were "violating [his] rights" by inspecting his belongings. In the bin, defendant Bengston discovered two sandwiches with lunch meat, some grape juice, and an open bag of chips. Jail rules prohibit inmates from storing food in their cells.

After he finished searching the bin, defendant Bengtson stepped into the dayroom and asked twice who occupied Cell C. Plaintiff did not respond. Knowing that the cell belonged to plaintiff, defendant Bengtson ordered plaintiff to return to his cell to be locked down for 24 hours as discipline for storing the food.

Instead of obeying the order, plaintiff argued that defendants were not allowed to search his cell. Defendant Bengtson told plaintiff that the deputies were allowed to search any cell they wished and that he could file a grievance if he did not believe they had acted appropriately. Once again, defendant Bengtson told plaintiff to step into his cell. Plaintiff walked slowly to his cell, complaining about the discipline he was going to receive.

As he stepped into his cell, plaintiff yelled obscenities at the deputies. Given plaintiff's increasing agitation and disrespect, defendant Bengtson decided to move plaintiff to a segregation cell to serve his 24 hours of lockdown. Defendant Bengtson called additional deputies to assist with transporting plaintiff to the segregation unit.

Defendant Wilson ordered plaintiff to lie on his bunk face down so that he could be handcuffed for the trip to segregation. Plaintiff refused to do so and stood sideways in a boxer's stance, with his hand clenched in a fist. Again defendant Wilson ordered plaintiff to lie down on his bunk and again plaintiff refused, speaking in an elevated and threatening tone of voice.

Defendant Wilson entered plaintiff's cell and ordered him to his bunk. Plaintiff increased the angle of his body toward Deputy Wilson and said in a low, angry voice "I'm not going to lay on my bunk."

At this point, defendant Wilson tried to apply an escort hold on Jenkins' left arm. As he did so, plaintiff stooped down and pulled away with enough force to break the hold. Plaintiff circled back toward defendant Wilson with his hand clenched in a fist. Defendant Wilson thought plaintiff was going to punch him; however, before plaintiff could throw his punch, Wilson reestablished an escort hold and tried to stabilize plaintiff on his bunk. Defendant Bengston joined defendant Wilson in the cell as they tried to push plaintiff back onto his bunk. Plaintiff continued to stand up and resisted being lowered onto his bunk. Both defendants told plaintiff to stop resisting their attempts to secure him.

The deputies succeeded in getting plaintiff down on the bunk, but as soon as they did so, plaintiff thrashed around and tried to free himself from the grasp of the deputies. He succeeded in breaking free of defendant Wilson's hold. As defendant Bengston tried to gain control of plaintiff's upper body, plaintiff swung his left arm back toward Bengston. Defendant Wilson saw plaintiff's elbow swinging in his direction, and noticed plaintiff's right hand coming toward him. Defendant Wilson struck plaintiff twice with a closed hand in the middle of his back.

At approximately the same time, defendant Bengston ordered plaintiff again to stop resisting. Plaintiff continued to resist. Defendant Bengston struck plaintiff three to four times with a closed fist on the left side of plaintiff's head, which was the only target available. Defendant Bengston hoped "to create dysfunction on the part of plaintiff," thereby inducing plaintiff

to comply with defendants' orders. (It is unclear whether defendant Bengston's intention was to render plaintiff unconscious or to cause him pain.)

Regardless, plaintiff continued to actively resist the deputies. Defendant Wilson grabbed plaintiff's arm, but plaintiff pulled away again. Again, both deputies ordered plaintiff to stop resisting and to lie down on his mattress. When he did not do so, defendant Bengtson delivered three to four knee strikes to the side of plaintiff's head. Defendant Wilson struck plaintiff twice with a closed fist, once on the right side of plaintiff's face and once on the back right side of his head.

Around this time, several more deputies arrived on the scene. Plaintiff stopped resisting and was placed on the floor of his cell. Defendant Bengtson was able to gain control of plaintiff's left hand; however, plaintiff's right arm remained tucked underneath his body and the deputy was unable to handcuff him. Defendant Bengtson bent plaintiff's left arm and placed it behind plaintiff's back, then trapped plaintiff's elbow with his left knee and bent plaintiff's wrist down as he applied pressure. Defendant Bengtson ordered plaintiff to bring his right arm out from under his body and released the pressure on plaintiff's wrist when he complied.

After plaintiff was handcuffed, there was a small amount of blood on his head and on the floor near his head. Plaintiff had a laceration approximately 1 cm. long on the top rear right side of his head, which stopped bleeding quickly. Defendant Bengtson asked plaintiff if he was injured, but plaintiff did not respond. When another deputy asked plaintiff if he was injured, plaintiff responded, "Man, let's just go."

Plaintiff was escorted to the segregation unit, directing expletives toward the deputies all the while. Once plaintiff was secured in a segregation cell, deputies requested that a nurse come to plaintiff' cell to examine him. Plaintiff refused to see her.

Plaintiff's next contact with medical staff occurred on August 31, 2005, when he completed a medical request form that stated:

> I've been having these migrain [sic] headaches since 8–22–05 after 9 pm I sustained some hits to the head and face and since have been having difficulty laying down because of these headache and head pains and temple migrains [sic] and nose pains basically face pains around nose and right side of face.

The following day a nurse examined plaintiff and found nothing remarkable. Her notes state:

> [Inmate] states was punched multiple times in r side of head and jaw. No ecchymosis, deformity, crepitus, hematoma, edema, laceration, scar tissue, abrasion. PERRL (bilaterally) [i.e., pupils are normal]. Frequent blinking during assessment. Coherent—No battle signs or raccoon eyes. Sclera white bilaterally. Pain r/t head. Will refer to MD for eval.

On September 2, 2005, a doctor examined plaintiff. He found nothing remarkable during the exam other than nasal congestion and a reported headache, for which he prescribed Tylenol and Sudafed.

In the four months prior to this incident, plaintiff had submitted three health request forms in the Dane County jail, complaining of headaches, sometimes accompanied by cold or flu-like symptoms.

## OPINION

### A. *Excessive Force*

First, a small point of procedure. When plaintiff filed his complaint, he alleged that

he was an inmate of the Dane County ail. He did not indicate why he was being held at the jail. Assuming that his incarceration was a result of a criminal sentence, I analyzed his claim under the Eighth Amendment's prohibition against cruel and unusual punishment.

■ Because plaintiff is now incarcerated at a Wisconsin state prison, it appears that he may have been at the jail awaiting trial and sentencing. (The parties have not proposed facts on this point, but in their brief, defendants refer to plaintiff as a pretrial detainee. Furthermore, a review of Wisconsin's Circuit Court Access Program indicates that plaintiff pleaded no contest to criminal charges in Dane County Case No. 05CF865 on February 28, 2006, shortly before he notified this court of his transfer to the Dodge Correctional Institution. Circuit Court Access Program, accessed May 17, 2006, available at http://wcca.wicourt s.gov/index.xsl.) If plaintiff was a pretrial detainee at the time of the August 22, 2005 incident, his excessive force claim arises under the Fourteenth Amendment's due process guarantee, rather than the Eighth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment"); *Dorsey v. St. Joseph County Jail Officials,* 98 F.3d 1527, 1528 (7th Cir.1996). Nevertheless, because the standards governing excessive force claims under the Fourteenth and Eighth Amendments are identical, *Wilson v. Williams,* 83 F.3d 870, 875 (7th Cir.1996), the distinction is a fine one and does not affect the disposition of plaintiff's claim.

■ In order to succeed on an excessive force claim, an inmate must show that jail officials "acted deliberately or with callous indifference, evidenced by an actual intent to violate his rights or with reckless disregard for his rights." *Id.* Because prison officials must sometimes use force to maintain order, the central inquiry for a court faced with an excessive force claim is whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine whether force was used appropriately, a court must consider any safety threat perceived by the officers, the need for the application of force, the relationship between that need and the amount of force used, the extent of the injury inflicted and the efforts made by the officers to mitigate the severity of the force. *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001).

■ It is undisputed that plaintiff actively resisted defendants' attempts to handcuff him and transport him safely to the prison's segregation unit, that defendants believed plaintiff was trying to punch them and that plaintiff's visible physical injuries were minor and short-lived. At the same time, it is undisputed that although plaintiff did not harm defendants, they hit him in the head repeatedly with their fists and with their knees. Defendants contend that their actions were reasonable in light of these facts; in his complaint, plaintiff characterized the force used by defendants as excessive.

Although the pure facts of this case are undisputed, the inferences to be drawn from them are not. Because those inferences are critical to the resolution of this case and because the choice of which inference to draw rests primarily upon the credibility of the parties, summary judgment is inappropriate. *Bell v. Irwin,* 321 F.3d 637, 641 (7th Cir.2003) ("When mate-

rial facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety."); *E.E.O.C. v. United Parcel Service,* 94 F.3d 314, 319 (7th Cir. 1996) (credibility determinations inappropriate at summary judgment stage). In this case, a reasonable jury could conclude even from defendants' version of events that defendants used excessive force on plaintiff. Whether this force was justified under the circumstances or was excessive and calculated to cause plaintiff more harm than was warranted is a question of fact best left to the jury. Therefore, defendants' motion for summary judgment will be denied.

### B. *Trial*

As noted above, plaintiff has not opposed defendants' motion for summary judgment. Plaintiff's last communication with the court was a letter dated December 30, 2005, dkt. # 26, in which he stated that his ability to pursue this case was being hampered by his physical disability. His failure to respond to defendant's motion, in combination with his letter, raises questions regarding plaintiff's ability to pursue his one remaining claim to trial.

It is an inefficient and expensive use of jurors to request that they assemble to hear plaintiff's case if plaintiff is not interested in pursuing it. Therefore, in an effort to insure that plaintiff is prepared for trial, I will require him to submit a letter to the court and to defendants' counsel by June 2, 2006, indicating whether he wishes to continue to pursue this case. If plaintiff fails to submit a response, I will dismiss the case with prejudice on the court's own motion. If he indicates that he is willing and ready to prosecute, the case will proceed to trial.

### ORDER

IT IS ORDERED that

1. Defendants' motion for summary judgment is DENIED;

2. Plaintiff may have until June 2, 2006, in which to serve and file a letter indicating whether he is actively preparing to take this case to trial on October 30, 2006. If, by June 2, 2006, plaintiff has not submitted such a letter, this claim will be dismissed with prejudice for his failure to prosecute.