In the

# United States Court of Appeals
### For the Seventh Circuit

No. 08-2960

DARRYL L. LEWIS,

*Plaintiff-Appellant,*

*v.*

MICHAEL D. DOWNEY, TODD SCHLOENDORF,
MICHAEL SHREFFLER, JEAN FLAGEOLE,
MIGUEL AYALA, and KANKAKEE COUNTY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 02091—**David G. Bernthal**, *Magistrate Judge.*

ARGUED MARCH 30, 2009—DECIDED SEPTEMBER 4, 2009

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. Darryl Lewis was a federal pris-
oner in custody at a county jail facility in northern Illi-
nois. Lewis filed a civil action pursuant to 42 U.S.C. § 1983
after jail officials shot him with a taser gun when
he failed to comply with an order to rise from his bed.
Lewis claimed the taser shot constituted cruel and
unusual punishment in violation of the Eighth Amend-

ment. He also attempted to present a Fourteenth Amendment claim arising from his placement in segregation without the benefit of a hearing. The district court dismissed Miguel Ayala, for lack of personal involvement, and we affirm that dismissal. Further, the district court granted summary judgment in favor of all other defendants. Darryl Lewis did not challenge on appeal the entry of summary judgment in favor of defendants Michael D. Downey, Todd Schloendorf, Jean Flageole and Kankakee County. The grant of summary judgment in favor of those defendants is affirmed. However, as to the remaining defendant pursued in this appeal, we are obligated to accept Lewis's version of events, and we vacate the grant of summary judgment in favor of Michael Shreffler and remand that portion of this case for further proceedings.

## I. BACKGROUND

In November 2005, a federal jury found Lewis guilty of being a felon in possession of a firearm. While awaiting sentencing and the entry of final judgment, Lewis was held in the Jerome Combs Detention Center, a county jail facility in Kankakee County, Illinois.[1] On January 26, 2006, Lewis engaged in a physical altercation with

---

[1] Due to a significant and unfortunate lack of federal pretrial detention housing throughout the United States, it is not unusual for federal prisoners awaiting trial or sentencing to be held in county jail facilities. *See* 18 U.S.C. § 4002 (empowering the Attorney General to contract with states or their political subdivisions "for the imprisonment, subsistence, care, and proper employment" of federal prisoners).

another inmate. Guard Todd Schloendorf entered the cell block, restrained Lewis, and placed him in segregation in the jail's maximum security area. According to Lewis, he was never given any type of hearing regarding his stay in segregation. The next day, Lewis began a hunger strike during which he refused to eat the jail's three daily meals. He continued the hunger strike for approximately twenty days, ending around February 15.

February 6 was Lewis's eleventh day of fasting. That morning, he rang the intercom in his cell and requested medical assistance because he was not feeling well. The officer responding to the call denied Lewis's request, asserting that Lewis had recently refused medical treatment. Lewis, who had previously received a bottle of Motrin-brand ibuprofen tablets from the nurse, held the bottle up to the security camera and told the officer over the intercom that he would "take care of my pain myself." In anger, he threw the bottle to the floor, and the pills and bottle scattered around his cell and under his bunk. Lewis then claims he became dizzy and tired. He laid down. Several minutes later, three guards— defendants Michael Shreffler[2] and Miguel Ayala and non-party Marlin Woods—entered Lewis's cell. Shreffler ordered Lewis off the bed.

---

[2] Throughout the record below, and the filings with this court, this defendant-appellee, has alternately been referred to as Michael Shreffler or Schreffler. For the sake of consistency, we will use the spelling as it appears in the district court's order of summary judgment: Michael Shreffler.

The parties dispute the events that followed. According to Lewis, he was weak from the hunger strike and sick from ingesting Motrin, rendering him sluggish and unable to respond quickly to Shreffler's directive. Instead of standing, Lewis says that he turned his head toward the officers, and before he could explain his failure to comply and without further warning or provocation, Shreffler shot him in the leg with a taser gun. Lewis asserts that the shock from the taser lasted several seconds and caused him to slide to the floor. The officers then handcuffed Lewis, took him from the cell, and cleaned up the scattered pills.

Shreffler, Ayala, and Woods each filed an affidavit. According to their version of events, they entered the cell in response to Lewis's threat to take an overdose of Motrin, which jail officials viewed as a suicide threat. Once inside, the officers claim that Shreffler ordered Lewis to lie on the floor with his hands behind his back so that they could handcuff him, an order that Shreffler repeated at least three times. Lewis refused each of these orders, cursing and yelling at the officers. It was then that Woods, the group's ranking member, ordered Shreffler to shoot Lewis with the taser, which he did. The officers removed Lewis from the cell and cleaned up the pills.

Acting *pro se*, Lewis filed a civil action pursuant to 42 U.S.C. § 1983.[3] The complaint contained two allegations

---

[3] An interesting question not presented by either party is the applicability of § 1983 to employees of a local correctional

(continued...)

relevant to this appeal. First, Lewis alleged that Shreffler and Ayala violated Lewis's Eighth Amendment right to be free of cruel and unusual punishment by shooting him with the taser. Second, Lewis averred that Officer Schloendorf ran afoul of the Fourteenth Amendment by placing him in segregation without a hearing.

The defendants filed a motion for summary judgment, which a federal magistrate judge granted on July 2,

---

[3] (...continued)
facility that is housing federal inmates under contract between the federal and local governments. *See* 18 U.S.C. § 4002. A county employee caring for federal prisoners arguably becomes a *federal* actor, rather than the requisite *state* actor, rendering § 1983 inapplicable. *See* 42 U.S.C. § 1983; *cf. Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring) (noting, in a different context, that federal prisoners whose custodians are not acting under color of state law cannot sue pursuant to § 1983); *Sandoval v. Wackenhut Corr. Corp.*, No. 93-8582, 1994 WL 171703, at *2 n.3 (5th Cir. Apr. 28, 1994) (recognizing that employees of a privately run correctional facility operated under contract with the federal government were not state actors for purposes of § 1983). Because it is not currently before us, we reserve our answer to the question for another day. We doubt, however, that the contractual relationship does anything to change the status of county jail employees as *state* actors. *Cf. Logue v. United States*, 412 U.S. 521, 528-32 (1973) (declining, for purposes of federal government liability under the Federal Tort Claims Act, to characterize as federal employees county jailers who were caring for federal prisoners).

2008.[4] In pertinent part, the magistrate judge found "that the force applied to Plaintiff was done in a good faith effort to maintain discipline and jail security and not to maliciously or sadistically cause harm to Plaintiff." The court further held that the taser was a *de minimis* use of force that did not implicate Eighth Amendment concerns. The court also dismissed Officer Ayala as a party to the lawsuit, stating that "he lacked any personal involvement in the February 6, 2006, incident." The court did not address Lewis's due process claim arising from his placement in segregation without a hearing.

## II. ANALYSIS

On appeal, Lewis contends that the magistrate judge erred by (1) dismissing Officer Ayala from the lawsuit; (2) granting the defendants' motion for summary judgment on his Eighth Amendment claim; and (3) refusing to address his Fourteenth Amendment claim.

### A. *Officer Ayala's Dismissal from the Lawsuit*

In their motion for summary judgment, the defendants argued that the court should dismiss Officer Ayala from the suit due to his lack of personal involvement in the

---

[4] Lewis filed his original action in the United States District Court for the Northern District of Illinois. The case was later transferred to the Central District of Illinois, where Kankakee County is located, after which the parties consented to proceed before a magistrate judge. *See* Fed. R. Civ. P. 73.

events surrounding the February 6 taser shot. The magistrate judge agreed and dismissed Ayala, a decision Lewis now claims was in error.

It is uncontested that Ayala played no direct role in the taser incident. Officer Shreffler fired the taser at the command of his superior officer, Corporal Woods. Even as a bystander, however, Ayala can be held liable under § 1983 if Lewis can show that Ayala (1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring. *See Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *see also Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

According to Lewis's version of events, which, as we will discuss below, we must accept as true on a motion for summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."), Ayala did not have a realistic opportunity to stop Shreffler from discharging the taser gun. In his deposition, Lewis discussed at length how quickly Shreffler shot him with the taser after ordering him off the bed. Lewis said that the shot came "[b]efore I could say I can't get up." Even assuming Lewis was as sluggish as he claims, if the time between the order and the shot was so brief that Lewis could not respond, we decline to hold Officer Ayala liable for failing to respond as well. Ayala's dismissal from the lawsuit was appropriate.

*B.  Lewis's Excessive Force Claim*

Turning next to Lewis's excessive force claim, we review *de novo* the district court's decision to grant summary judgment. *See Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir. 2001). Summary judgment is appropriate if, after resolving all disputed facts and drawing all reasonable inferences in favor of Lewis, the nonmoving party, there remains no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson*, 477 U.S. at 248 (stating that summary judgment is precluded "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Lewis filed suit pursuant to 42 U.S.C. § 1983, which provides that a person may not be deprived of any constitutional right by an individual acting under color of state law. The act authorizes claimants to sue persons in their individual capacities who are alleged to have violated such rights. *See Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) ("[A § 1983] plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." (quotations omitted)); *see also* 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

Lewis's claim on appeal is that Shreffler[5] applied exces-

---

[5] Officers Ayala and Woods entered Lewis's cell with Shreffler. We have approved Ayala's dismissal from the suit, and Lewis did not name Woods as a defendant, leaving Shreffler as the

(continued...)

sive force when he shot Lewis with a taser gun, thereby violating the Eighth Amendment's prohibition on cruel and unusual punishment. Before addressing that question, however, we consider the Eighth Amendment's applicability to someone in Lewis's position, i.e., a person found guilty but awaiting sentencing and final judgment.

### 1. *The Eighth Amendment's Applicability to Pre-Sentencing Detainees*

Although the Supreme Court has not provided a definitive answer, we doubt that the Eighth Amendment was the proper vehicle for Lewis's suit. As we will explain, it is unlikely that Lewis, who was awaiting sentencing and the entry of final judgment, had yet accrued Eighth Amendment protections. Instead, Lewis's claims should have been framed in terms of the Fourteenth Amendment's Due Process Clause.

The scope of an individual's right to be free from punishment—and, derivatively, the basis for an excessive force action brought under § 1983—hinges on his status within the criminal justice system. *See Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). On one end of the spectrum are sentenced prisoners. The Eighth Amendment protects these individuals only from the infliction of cruel and unusual punishment, which is often defined in the prison context as the "'unnecessary and wanton infliction of pain.'" *Wilson*

---

[5] (...continued)
only remaining defendant on appeal of Lewis's excessive force claim.

*v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Pretrial detainees, by contrast, have not been convicted or sentenced and thus are not yet "punishable" under the law. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). This means that pretrial detainees "may not be 'punished' by the state *in any way*." *Wilson*, 83 F.3d at 875 (emphasis added). As such, pretrial detainees couch excessive force claims as violations of their Fourteenth Amendment rights to due process, not infringements on the Eighth Amendment's ban on cruel and unusual punishment. *See Brown*, 398 F.3d at 910; *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002); *Pardue ex rel. Estate of Cole v. Fromm*, 94 F.3d 254, 259 n.1 (7th Cir. 1996).

In some contexts, such as claims of deliberate indifference to medical needs, the Eighth and Fourteenth Amendment standards are essentially interchangeable. *See, e.g.*, *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007); *Guzman v. Sheahan*, 495 F.3d 852, 856-57 (7th Cir. 2007); *Whiting v. Marathon County Sheriff's Dep't*, 382 F.3d 700, 703 (7th Cir. 2004). But the distinction between the two constitutional protections assumes some importance for excessive force claims because the Due Process Clause, which prohibits all "punishment," affords broader protection than the Eighth Amendment's protection against only punishment that is "cruel and unusual." *See Wilson*, 83 F.3d at 875 (noting that the Fourteenth Amendment's protection "necessarily extends beyond the prohibition of merely 'cruel and unusual'

punishment," resulting in "a higher standard [of protection] than that provided by the Eighth Amendment"); *see also Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988). Although the exact contours of any additional safeguards remain undefined, *see Wilson*, 83 F.3d at 875, it is nonetheless important that we identify the appropriate source of Lewis's constitutional protection against the use of excessive force, *see Graham v. Connor*, 490 U.S. 386, 394 (1989) (noting that analysis of excessive force claims brought pursuant to § 1983 "begins by identifying the specific constitutional right allegedly infringed").

At the time of relevant events, Lewis was neither a pretrial detainee nor a sentenced prisoner. He had been found guilty in a federal court and was in a county jail awaiting sentencing and the entry of final judgment. The question is whether a person in this purgatory within our criminal justice system is cloaked with the Eighth Amendment's limited safeguards against only "cruel and unusual" punishment or the Fourteenth Amendment's broader protections against punishment "in any way." *See Wilson*, 83 F.3d at 875.

The Supreme Court has not directly addressed whether the Eighth Amendment is applicable to pre*sentencing* detainees, but it has indicated that the answer is no. According to the Court, "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). The Court later confirmed that such a "formal adjudication"

includes both conviction and sentence. *Graham*, 490 U.S. at 392 n.6 (noting that *Ingraham* established that "the Eighth Amendment's protections did not attach until after conviction *and sentence*" (emphasis added)); *see also Anderson*, 836 F.2d at 348 ("The Eighth Amendment . . . is applicable only to those criminals who are serving a sentence."); *Bailey v. Andrews*, 811 F.2d 366, 373 (7th Cir. 1987) ("[T]he eighth amendment right . . . is applicable only to sentenced criminals.").

This would mean that Eighth Amendment rights had not yet vested in Lewis, who had not been sentenced. Absent Eighth Amendment protections, his status would be analogous to that of a pretrial detainee, meaning that the basis for his § 1983 action should have been the Fourteenth Amendment Due Process Clause. *See Butera*, 285 F.3d at 605; *Pardue ex rel. Estate of Cole*, 94 F.3d at 259 n.1.

The problem is that Lewis, acting *pro se*, alleged violations of only the Eighth Amendment, a line of argument that his appointed counsel maintains on appeal. Further complicating the issue is that defendants have not objected to the improper basis for Lewis's action—a calculated move perhaps, given that Lewis is seeking more limited protection than he might otherwise deserve. *Cf. Blake v. Katter*, 693 F.2d 677, 682-83 (7th Cir. 1982) (liberally construing *pro se* complaint and remanding when district court, acting on defendant's motion, dismissed action for improperly seeking redress under the Eighth Amendment), *overruled on other grounds by Wilson v. Garcia*, 471 U.S. 261 (1985).

As we have made clear, anything that would violate the Eighth Amendment would also violate the Fourteenth

Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a person . . . are at least as great as the Eighth Amendment protections . . . ."); *Wilson*, 83 F.3d at 875. Thus, we conclude that although we must evaluate Lewis's claims under what we believe is the proper basis—here, the Fourteenth Amendment—we will do so only insofar as the alleged conduct would have violated the Eighth Amendment as well; we will not consider any safeguards the Fourteenth Amendment provides beyond those it shares with the Eighth Amendment. Lewis has argued only for these more limited protections. *See Pardue ex rel. Estate of Cole*, 94 F.3d at 259 n.1 (finding claim of broader Fourteenth Amendment rights forfeited when plaintiff sought redress only under Eighth Amendment standard). With that understanding, we turn now to Lewis's claims.

### 2. Use of a Taser Gun to Compel Compliance

The "unnecessary and wanton infliction of pain" on a prisoner violates his rights under the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992). But not every "malevolent touch" by a security officer implicates the Constitution. *Hudson*, 503 U.S. at 9. The use of *de minimis* force, so long as it "is not of a sort repugnant to the conscience of mankind," is not of Eighth Amendment concern. *Id.* at 9-10 (quotations omitted). If the force were more than *de minimis*, we must consider whether it "was applied in a good-faith effort to main-

tain or restore discipline, or maliciously and sadistically
to cause harm." *Id.* at 7.


   *a. Taser Gun:* De Minimis *Application of Force?*

   As one basis for his decision, the magistrate judge found
that the use of the taser gun was a *de minimis* application
of force. We disagree. It is undisputed that the taser sent
an electric shock through Lewis's body strong enough
to cause him to fall from the bed and render him
helpless while officers secured him and removed him
from the cell.

   As the Supreme Court has said, pain, not injury, is the
barometer by which we measure claims of excessive
force, *see id.* at 9, and one need not have personally en-
dured a taser jolt to know the pain that must accompany
it, *see Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("[A]
stun gun inflicts a painful and frightening blow [that]
temporarily paralyzes the large muscles of the body,
rendering the victim helpless."); *see also Matta-Ballesteros
v. Henman*, 896 F.2d 255, 256 n.2 (7th Cir. 1990) (noting
that a taser "sends an electric pulse through the body of
the victim causing immobilization, disorientation, loss of
balance, and weakness"). Thus, we hold, as the first
rung in the ladder of our analysis, that the use of a taser
gun against a prisoner is more than a *de minimis* applica-
tion of force.

   Although such force against an inmate rises above the
inconsequential and into the constitutional realm, we
reiterate an obvious point: simply because a taser gun's

use is more than *de minimis* force does little, if anything, to alter its *appropriate* use within our detention system. *See Hickey*, 12 F.3d at 757 (finding a taser's use more than *de minimis* only "*if inflicted without legitimate reason*" (emphasis added)). We remain cognizant of the important role that non-lethal, hands-off means—including taser guns—play in maintaining discipline and order within detention facilities. *See Soto v. Dickey*, 744 F.2d 1260, 1267-70 (7th Cir. 1984).

Our conclusion merely shifts the focus of our inquiry away from the act and to the actor, away from the objective and to the subjective. *See Hudson*, 503 U.S. at 8 (distinguishing between the objective question of whether an act is "harmful enough" and the subjective question of whether an actor possessed a culpable state of mind); *Hickey*, 12 F.3d at 756-57. What matters—and what will generally be the decisive factor in cases such as this—is the mindset of the individual applying the force. That is the question to which we now turn.

### b.  *Officer Shreffler's State of Mind*

As we stated above, only the "unnecessary and wanton infliction of pain" violates a prisoner's rights under the Eighth Amendment. *Whitley*, 475 U.S. at 319 (quotations omitted). The Constitution is not offended when force is used "in a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 7. Non-*de minimis* force runs afoul of the Eighth Amendment only when it is intended "maliciously and sadistically to cause harm." *Id.*

The court below could have rested the grant of summary judgment on its finding of *de minimis* force alone, *see id.* at 9-10 (excluding from "constitutional recognition" the application of *de minimis* physical force), but the magistrate judge, as an alternative basis, found that Officer Shreffler used the taser gun "in a good faith effort to maintain discipline and jail security and not to maliciously or sadistically cause harm to Plaintiff." Resolving, as we must, disputed facts in Lewis's favor, we cannot agree.

Lewis argues that the use of the taser gun was without penological purpose and was therefore *per se* malicious. *See Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (noting that the infliction of pain is *per se* malicious if it is done "'totally without penological justification'" (quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002))). On the contradictory record before us, we cannot conclude, as a matter of law, that Shreffler's actions were without penological justification. Such a determination rests upon disputed questions of fact that should be left to the jury to resolve.

Jails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners. *See Bell*, 441 U.S. at 546 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."); *Soto*, 744 F.2d at 1269 (according

prison officials wide-ranging deference to adopt and execute policies "needed to preserve internal order and discipline"). We have previously discussed how important it is that prisoners follow orders:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Soto*, 744 F.2d at 1267; *see also Colon v. Schneider*, 899 F.2d 660, 668-69 (7th Cir. 1990).

In many circumstances—often when faced with aggression, disruption, or physical threat—compelling compliance with an order is a valid penological justification for use of a taser. *See Hickey*, 12 F.3d at 759 (recognizing that prison officials "may compel compliance with legitimate prison regulations" through the use of summary physical force). But such justification does not necessarily exist every time an inmate is slow to comply with an order. *See Treats v. Morgan*, 308 F.3d 868, 873 (8th Cir. 2002) ("Not every instance of inmate resistance justifies the use of force . . . ."). What must be decided in each case, and the issue to which we next turn, is whether the facts surrounding the taser's deployment—as Lewis portrays them—demonstrated actual malice or sadistic purpose on the part of the user.

Several factors are relevant in determining whether a defendant applied force in good faith or for purposes of causing harm, including the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force. *Fillmore*, 358 F.3d at 504; *see also Whitley*, 475 U.S. at 321. The exact sequence of events leading to the taser's use in this case is strongly disputed, but we are required to view the facts in the light most favorable to Lewis. *Anderson*, 477 U.S. at 255. Doing so, we conclude that Lewis has raised a genuine issue of material fact regarding Shreffler's mental state at the time he discharged the taser, thereby precluding summary judgment.

In cases upholding the use of taser guns, the victims have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others. Such behavior certainly increases the need for force and often poses a threat to the security officers. In *Jackson v. Thalacker*, 999 F.2d 353 (8th Cir. 1993), for example, a prisoner verbally threatened a guard, clenched his fists, and then lunged at the guard. *Id.* at 354. The Eighth Circuit condoned the use of a taser to subdue the inmate. *Id.* Similarly, in *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992), the Sixth Circuit upheld the use of a stun gun against an inmate who became aggressive and confrontational when his requests to be let out of his isolation cell were denied. *Id.* at 596-97, 602. For seven hours, he shouted at the jailer and kicked the cell door, persisting in this behavior despite warnings that he would be forced to comply if he did not calm down. *Id.*

at 597. The Tenth Circuit, in an unpublished decision, also approved the use of a taser to force compliance with an order given moments after the prisoner had engaged in a physical altercation with security officers. *Hunter v. Young*, 238 F. App'x 336, 339 (10th Cir. 2007). Finally, this court has previously upheld the use of a stun gun to calm a prisoner who was banging his head against his concrete bed and struggling against the guards who were attempting to restrain him. *Dye v. Lomen*, 40 F. App'x 993, 995-96 (7th Cir. 2002).

Similar examples of aggressive or threatening behavior are noticeably absent from Lewis's version of events. At the time he was shot, Lewis asserts that he was merely lying on his bunk, weak and sluggish from more than ten days without food, when Shreffler ordered him to get up. Lewis claims that he said nothing and had time only to turn his head toward the doorway before Shreffler shot him with the taser. In Lewis's story, he was given a single order that was not repeated or accompanied by any warning that his failure to comply would result in use of the taser.

Looking at the sequence of events as alleged by Lewis, we find several facts troubling: the absence of any agitation or threat from Lewis; the short passage of time between Shreffler's order and the taser shot; Shreffler's single, unrepeated order; and the dearth of warnings regarding the consequences of Lewis's failure to comply.

We do not intend to mandate a checklist that detention officers must follow before they may constitutionally

employ a taser. As we have said, we entrust officers with the discretion to act appropriately in light of the circumstances confronting them. In a jail or prison setting, it is not hard to imagine any number of scenarios that would justify the immediate and unadvertised use of summary force, including taser guns.

But, *based on Lewis's facts*, we cannot say that Shreffler acted in good faith. Nor can we say that he acted maliciously or wantonly. Our only conclusion is that if we accept as true Lewis's version of the events surrounding the taser shot, he has raised a genuine issue of material fact regarding Officer Shreffler's state of mind when Shreffler fired the taser gun. That is enough to preclude summary judgment. What he will be able to prove at trial is a different question altogether, but Lewis has presented enough here that if the jury accepted his story, it could find in his favor. That is all we require. *See Anderson*, 477 U.S. at 248 (stating that summary judgment is precluded "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

### 3. Qualified Immunity

Shreffler's only remaining basis to support summary judgment is through the protection of qualified immunity, an argument that he presented in his motion to the magistrate judge. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The magistrate judge decided the case on other grounds and did not reach the immunity question. We consider it now and conclude that Officer Shreffler is not immune from potential liability.

To defeat a defense of qualified immunity, Lewis must demonstrate (1) that the guard's conduct violated his constitutional rights, and (2) that the violated right was clearly established at the time of the alleged misconduct. *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *see also Harlow*, 457 U.S. at 818; *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). As should be clear from the preceding discussion, the answer to the first part of this test hinges on the resolution of fact questions that are now in the jury's hands. *See Hill v. Shelander*, 992 F.2d 714, 717-18 (7th Cir. 1993). Thus, we can dismiss the case on summary judgment only if we find that the right that Shreffler allegedly violated was not clearly established at the time of the purported misconduct. *See id.* at 718. This is a question of law. *Marshall v. Allen*, 984 F.2d 787, 793 (7th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)).

To remove from Shreffler the shield of qualified immunity, the right that he allegedly violated must be clearly established "'in a particularized sense.'" *Hill*, 992 F.2d at 718 (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992)). This does not mean that the "very action in question" must have previously been held unlawful. *Juriss*, 957 F.2d at 350 (quotations omitted). Instead, we must determine whether, operating under the state of the law as it existed at the time of relevant events, "a reasonable officer would have known that the particular action at issue . . . was unlawful." *Id.*; *see also Hope*, 536 U.S. at 739 (stating that the contours of a constitutional right "must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right" (quotations omitted)); *Hill*, 992 F.2d at 718.

We hold that a reasonable officer would understand that employing a taser gun under the version of the facts that Lewis has described would violate the prisoner's constitutional rights. Our case law makes this clear. In *Soto*, 744 F.2d 1260, for example, a case the defendants cite at length, we approved the use of chemical agents, including mace and tear gas, "when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners." *Id.* at 1270. We also said that similar means were appropriate in other circumstances, such as compelling compliance with orders, but we cautioned that such force could not be "exaggerated or excessive" and should generally follow "adequate warning[s]." *Id.* at 1270-71. Similarly, in *Dye*, 40 F. App'x 993, we upheld a stun gun's use to subdue a struggling prisoner who was risking injury to himself and others. *Id.* at 996.

Lewis claims that he was prone on his bed, weakened, and docile. He asserts that he was told to rise one time and was not warned that a taser would be used against him if he failed to comply. He states that he was scarcely given enough time to turn his head and did not otherwise respond to Shreffler's order. If these truly are the facts, no reasonable officer would think that he would be justified in shooting Lewis with a taser gun. Accepting Lewis's story, we conclude that Officer Shreffler is not entitled to qualified immunity.

C.  *Fourteenth Amendment Right to a Hearing Before Being Placed in Segregation*

Lewis's final argument is that the magistrate judge erred by failing to address his Fourteenth Amendment Due Process claim that arose from his placement in segregation without a hearing. We hold that because the claim was not properly before the magistrate judge, he was correct not to address it, and we decline to address the claim as well.

Section 1915A of Title 28 of the United States Code establishes a screening procedure by which a district court evaluates prisoner civil rights claims for purposes of identifying those that have arguable merit. It provides that a district court "shall review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental . . . officer or employee." 28 U.S.C. § 1915A(a). After conducting this review, the court "shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if [it] is frivolous . . . or fails to state a claim upon which relief may be granted." *Id.* § 1915A(b)(1).

In its local rules, the Central District of Illinois has specified the procedure that it uses to conduct the § 1915A screening. *See* Fed. R. Civ. P. 83(a)(1) (empowering district courts to enact local rules that are consistent with federal law and rules of practice). The relevant local rule provides as follows:

> If practicable, the Court will conduct a merit review of the complaint before service is ordered, and enter a Case Management Order delineating

the viable claims stated, if any. . . . [T]he case shall proceed *solely* on those claims identified in the Case Management Order. *Any claims not defined in the Case Management Order will not be included in the case . . . .*

C.D. Ill. R. 16.3(C) (emphases added). Thus, one method the Central District has established for dismissing unwarranted claims, as required under § 1915A, is to omit them from its case management order. That is what occurred here.

On March 19, 2007, the district court conducted a merit review as provided in Local Rule 16.3. The following day, it issued a case management order that defined the issues that Lewis could pursue in his civil action. The order, to which Lewis never objected, made no mention of Lewis's stay in segregation or the jail's failure to conduct any related hearings. As set forth in Local Rule 16.3, the absence of any such claim in the case management order resulted in its elimination from the case.

When evaluating the defendants' motion for summary judgment, the magistrate judge adhered to the court's local rules and considered only those claims approved in the case management order. Lewis could not resurrect that claim then, and he cannot resurrect it now. Were we to now consider its merits, we would be disregarding the integrity of the system established by the district court. This we decline to do.

### III. CONCLUSION

We AFFIRM the magistrate judge's dismissal of Miguel Ayala as a party to the lawsuit. Darryl Lewis did not challenge on appeal the entry of summary judgment in favor of Michael D. Downey, Todd Schloendorf, Jean Flageole, and Kankakee County, and that portion of the summary judgment is AFFIRMED. However, as to Michael Shreffler, the remaining defendant that was pursued in this appeal, we VACATE the grant of summary judgment in his favor and REMAND that portion of this case for further proceedings. Finally, we decline to consider the merits of Lewis's due process argument. It is not properly before us.