**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted January 18, 2022[*]
Decided January 27, 2022

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 21-2175

| | |
|---|---|
| QUENTRELL E. WILLIAMS, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 18-cv-1008-wmc |
| DANE ESSER, et al., *Defendants-Appellees*. | William M. Conley, *Judge*. |

**O R D E R**

Quentrell Williams's tendency toward self-harm led prison staff to use force against him on four occasions. Williams sued, arguing that each use of force was malicious and thus violated his rights under the Eighth Amendment. The district court entered summary judgment on the claims about each incident. We affirm in large part,

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

but conclude that, regarding the third incident, a jury could find that a guard maliciously used a Taser on an already fully restrained and compliant Williams. We vacate on that claim only and remand for further proceedings.

## Background

Unless otherwise noted, we present the facts from the record in the light most favorable to Williams, the non-movant, as we must do when reviewing a summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Williams is asthmatic; his medical file warns that pepper spray or other incapacitating airborne agents may harm him. All four interactions in this suit occurred in 2013 at the Wisconsin Secure Program Facility in Boscobel, Wisconsin when prison staff used force, including pepper spray, other airborne incapacitating agents, and a Taser, on Williams.

The first incident, on March 3, occurred when Williams was under observation because of his risk of self-harm. A guard gave Williams a glass bottle with nasal spray in it. Williams broke the bottle and began chewing the glass. (The district court allowed Williams to proceed to trial on his claim that, when this guard gave Williams the glass, the guard deliberately ignored the serious risk it posed to his health; that claim later settled and is not part of this appeal.) Upon learning what Williams was doing, Dane Esser, a prison lieutenant, ordered Williams to spit out the glass. When Williams refused, Esser misted him with pepper spray, knowing (according to Williams) of his sensitivity to it. Williams stopped chewing the glass and allowed himself to be restrained. Williams was then removed from his cell, examined by a nurse, allowed to shower off the residual spray, and strip searched.

The second incident occurred on May 25, when Williams covered his cell's window and camera with feces. Esser went to check on him and ordered him to remove the covering, but Williams was asleep and did not answer. Unable to see Williams or verify that he was not harming himself, Esser warned that if Williams continued not complying, he would use spray. Receiving no response, Esser shot one burst of spray. Still receiving no response, Esser shot a second burst. After the second burst Williams came to the cell door to allow himself to be restrained. A nurse then treated Williams by administering an inhaler and then clearing him to return to his cell. When Williams was still having trouble breathing, anther nurse provided a nebulizer treatment.

The third incident, which involved the Taser, occurred in June. Williams had covered his cell's front window, this time with a lunch tray. Esser, who came to talk to Williams, could see Williams through a plexiglass door. Williams assured Esser that he

was not harming himself. Esser, however, says that he saw something in Williams's mouth. He therefore assembled a cell-extraction team, which entered the cell, restrained Williams at his wrists and ankles, and removed him from his cell to be strip searched.

During the strip search, Williams was naked, restrained at his wrists and ankles, and on his knees. Esser ordered Williams to open his mouth so that "staff could look into it" to check for contraband. Williams swears that he opened his mouth as directed. (Esser disputes Williams's sworn statement, but at the summary-judgment stage we accept Williams's account.) After Williams opened his mouth for the search, team members applied pressure to his jaw. Esser then used his Taser on Williams. Esser first tested the device to ensure that it worked. Then Esser shocked Williams on his chest. Esser performed a "Drive" stun—using the Taser without its probe and without any neuromuscular incapacitation—on Williams' right upper pectoral area for approximately 2 to 3 seconds. Nothing was found in Williams's mouth. Williams asked to see a nurse, but because he had no observed injuries, he did not see one.

The fourth incident occurred just a few days later. After receiving word that Williams might be harming himself, Esser went to Williams's cell and saw Williams with an object that might be a rope around his neck. Esser ordered him to remove it, but Williams pulled it tighter. Believing that he needed to act quickly, Esser deployed escalating levels of force. First, he fired pepper-spray-like foam into Williams's cell and then pepper-spray-like mist. Williams fell to the floor, he says, fading in and out of consciousness. But he kept his arms near his neck and continued to defy Esser's orders to desist. Esser then fired a pepper ball, a projectile that bursts on impact and releases an incapacitating inhalant. Williams yelled at Esser and continued to disobey orders to remove the object from his neck. Esser then fired pepper balls at Williams's body, still prone, after which Williams finally approached the cell door to be restrained. Williams was then seen by a nurse and was later medically cleared to return to his cell.

Williams sued prison officials for violating his Eighth Amendment rights, alleging that Esser's use of force on all four occasions was malicious and that the other defendants failed to intervene or deliberately ignored his serious medical needs. The district court ruled that no reasonable jury could find in favor of Williams. It explained that Esser used reasonable force to prevent Williams from harming himself, the other defendants thus had no duty to intervene, and they did not ignore Williams's medical needs. Williams challenges these rulings on appeal.

### Discussion

We first address the third incident. Williams argues that the district court improperly resolved a factual dispute in Esser's favor. In his view, the court should have allowed a jury to decide whether to credit his account that while restrained he compliantly opened his mouth *before* Esser needlessly and therefore maliciously shocked him in the chest with a Taser. A use of force violates the Eighth Amendment if applied "maliciously or sadistically for the very purpose of causing harm." *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). Whether a guard applied force maliciously turns on factors including the threat reasonably perceived by the guard, the need for and amount of force used, efforts made to temper the severity of force used, and the harm suffered by the prisoner. *See id*. at 320–21; *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009).

Under these factors, a reasonable jury could find that Esser maliciously used the Taser. Williams was restrained at his wrists and ankles, naked, and on his knees when Esser shocked him. Although ensuring compliance with orders can justify force, *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992), after guards had restrained Williams, stripped him, and forced him to the floor, according to Williams's sworn statement, he complied by opening his mouth as ordered and permitting the search. A jury could therefore reasonably conclude that when Esser electrocuted Williams's chest with the Taser *after* Williams was restrained and compliant, Esser acted maliciously. And even if the Taser did not yield lasting injury, it can cause "intense pain," *Abbot v. Sangamon County, Ill.*, 705 F.3d 706, 726 (7th Cir. 2013), and "pain, not injury," is a measure of Eighth Amendment harm. *Lewis*, 581 F.3d at 475 (citing *Hudson*, 503 U.S. at 9).

We recognize that Esser disputes that Williams opened his mouth before he used the Taser, but a jury must resolve whether Esser or Williams is telling the truth about compliance; the question cannot be resolved at summary judgment. *See Lewis*, 581 F.3d at 478. Esser responds that he is nonetheless entitled to qualified immunity. But if a jury credits Williams's account that Esser needlessly jolted him with a Taser while he was docile and compliant, qualified immunity may not be appropriate. *See id.* at 479. We warn, however, that a litigant who has lied in a sworn statement to secure relief or to defeat an appeal may face severe sanctions. *See Rivera v. Drake*, 767 F.3d 685, 686–87 (7th Cir. 2014).

For the other three incidents, the district court properly ruled that no reasonable jury could find that Esser's use of force violated Williams's rights under the Eighth

Amendment. The record indisputably shows that, on each occasion, Esser reasonably used force to prevent Williams from harming himself. *See Whitley*, 475 U.S. at 319.

For the first incident, Williams argues that it was malicious for Esser to mist him with pepper spray when Esser knew that he was sensitive to it. But Williams does not dispute that, despite Esser's command to cease chewing glass, Williams continued to do so, thereby endangering himself and necessitating further action. And given the presence of glass shards, which Williams could use to harm others, Esser reasonably believed that he needed to avoid physically engaging with an unrestrained Williams; misting him with the spray was therefore permissible. Esser stopped misting Williams once he ceased chewing and allowed himself to be restrained. Based on these facts, no reasonable jury could find that Esser used force maliciously.

Regarding the second incident, Williams argues that it was malicious for Esser to spray him twice while he was sleeping. But Williams does not dispute that, because he had covered his windows and camera, guards who were assigned to observe him for self-harm could not see him. Nor does he dispute that, both before and after the first spraying, he did not respond to Esser to allay concerns that Williams might be harming himself. Thus, no jury could find that the first or second spray inflicted harm unreasonably; rather the sprayings allowed the guards to attempt to prevent serious harm without endangering themselves.

For the fourth incident, Williams argues that Esser was malicious because he used escalating force while Williams was fading in and out of consciousness. But it is undisputed that, while he was in this state, Williams kept his arms up by his neck, which had something tied around it, defied an order to move them away, and yelled back at Esser who was commanding him to do so. Thus, Esser reasonably perceived that Williams was refusing to cease strangling himself. Given Esser's perception, a reasonable jury could not find that he used force maliciously.

We can readily dispatch Williams's remaining arguments. First, he contends that the district court incorrectly entered summary judgment for the other defendants on his claim that they had a duty under the Eighth Amendment to intervene and prevent Esser's use of spray. But given that his force was lawful, these claims fail. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (no failure to intervene claim if force is lawful). Second, he contends that these defendants were deliberately indifferent to his medical needs. But he does not present any evidence that these defendants knew that Williams had unmet medical needs as a result of the use of force or that they refused his requests for treatment. To the contrary, after each incident that aggravated his asthma, he was

brought to a nurse and medically cleared. Finally, Williams also argues that the district court erred in not recruiting counsel and an expert witness for him. But he gives us no persuasive reason to believe that counsel would have made a difference on the claims that properly ended at summary judgment. *Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007). These claims depended solely on lay testimony and records readily available to Williams. And because Williams's claims turn mainly on lay questions of historical fact and subjective motivation, no expert testimony was needed to resolve them.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.